**Richard T. SCHWEIZER and Richard T. Schweizer as Parent and Natural Guardian of Scott Schweizer, Plaintiffs,**

v.

**John H. MULVEHILL, Esq. and Urban S. Mulvehill, Esq., Defendants.**

**No. 95 CIV. 10743 MGCMHD.**

United States District Court,
S.D. New York.

March 31, 2000.

W. Robert Curtis, Curtis & Riess–Curtis, P.C., New York City, for Plaintiffs.

Geoffrey W. Heineman, Ohrenstein & Brown, LLP, John A. McManus, Conway Farrell Curtin & Kelly, New York City, for Defendants.

### MEMORANDUM ORDER

CEDARBAUM, District Judge.

In a thorough and thoughtful Report and Recommendation, Magistrate Judge Dolinger has recommended that defendants' motion for summary judgment be granted as to all claims against John Mul-

vehill. He has recommended that the motion be granted as to all claims against Urban Mulvehill except the portion of plaintiffs' breach of fiduciary duty claim which alleges that Urban Mulvehill failed to disclose to plaintiff that he was receiving a portion of John Mulvehill's fee. Finally, he has recommended that John Mulvehill's motion for sanctions and preclusion of the use of certain evidence be denied. No objections have been filed within the ten days provided by 28 U.S.C. § 636(b)(1).

After carefully reviewing the attached Report and Recommendation, I accept it in its entirety.

SO ORDERED.

### REPORT & RECOMMENDATION

DOLINGER, United States Magistrate Judge.

To The Honorable Miriam Golden Cedarbaum, District Judge:

Following a car accident in which his wife was killed and his son injured, Richard Schweizer retained attorney John Mulvehill to pursue a wrongful-death and personal-injury lawsuit against the driver of the other vehicle involved in the collision and the driver's employer. After a suit was filed in federal court, the parties reached a settlement by which the plaintiff was to receive approximately $1 million.

On behalf of his son and himself, Schweizer now sues his attorney in that previous action and the attorney's cousin, Urban Mulvehill, Esq., with whom John Mulvehill was to share fees on the wrongful-death claim. Following completion of discovery, defendants have moved for summary judgment on all of plaintiff's claims. In addition, John Mulvehill seeks an order (1) precluding plaintiff from using certain salary information obtained in response to a non-party subpoena and (2) imposing sanctions on plaintiff in connection with the subpoena.

## A. *Plaintiff's Claims*

Plaintiff filed this lawsuit in December 1995, asserting five claims against John and Urban Mulvehill, all related to their representation of him in *Schweizer v. Skyway Transportation*, 90 Civ. 0979 (S.D.N.Y.) (JFK) ("the underlying action"). First, Schweizer alleges that both attorneys committed legal malpractice and "gross legal malpractice" (1) by negligently preparing and prosecuting the underlying action, (2) by failing to inform him that he might compensate John Mulvehill other than through a one-third contingency arrangement, and (3) by failing to disclose conflicts of interest, presumably including the fact that Urban Mulvehill would share a part of the contingency fee recovered and that John Mulvehill was employed by an insurance company. (*See* Compl. ¶¶ 59, 74–78).

Plaintiff's second claim is for breach of contract. He asserts principally that John Mulvehill breached the terms of the retainer agreement by settling the underlying action for $1 million when he had promised to prosecute the case for more than that. (*Id.* at ¶ 80). He also asserts that the retainer agreement was breached for the reasons stated in his malpractice claim. (*Id.* at ¶¶ 81–84).

Third, plaintiff asserts a claim for fraud, alleging that the defendants made misrepresentations to him, that he relied upon those misrepresentations, and that he was thereby damaged. (*Id.* at ¶¶ 86–88). Specifically, he alleges that defendants either misstated or withheld the following information: (1) they did not disclose that there were fee arrangements besides a contingency by which plaintiff could have agreed to pay John Mulvehill; (2) John Mulvehill falsely stated that he would prosecute the underlying action for more than the $1 million limit of the insurance policy; (3) defendants concealed conflicts of interest in handling his case; (4) defendants misled plaintiff into believing that the underlying action was a more complex case than it was; (5) defendants misrepresented that it

would be impossible to recover more than $1 million from the defendants in the underlying action; (6) defendants falsely asserted that plaintiff had made statements that he had not; and (7) defendants failed to disclose that Urban Mulvehill would receive a fee for referring the underlying action to John Mulvehill. (*Id.* at ¶ 86(A–G)).

Fourth, plaintiff asserts that defendants violated section 487 of the New York Judiciary Law by misleading the Surrogate's Court through the presentation of false information and the omission of material information. (*Id.* at ¶¶ 90–92). These alleged misrepresentations and omissions are the same as those alleged in connection with the fraud claim. (*Id.* at ¶ 90(A–G)).

Finally, plaintiff makes a claim for breach of fiduciary duty. He alleges that defendants were in a fiduciary relationship with him and that by acting in their own interests in settling the case for the policy limit, and by withholding information, including the existence of a referral fee and John Mulvehill's employment, the attorneys breached that duty. (*Id.* at ¶¶ 94–100).

Plaintiff demands $1 million in compensatory damages for each of his claims and $3 million in punitive damages for each claim except the one for breach of contract. (*Id.* at 27–28 (¶¶ 1–5)).

## B. *Defendants' Summary Judgment Motion*

Defendants have filed a motion seeking summary judgment on all of plaintiff's claims. First, defendants assert that the claims of legal malpractice, breach of contract and breach of fiduciary duty are barred, under the doctrine of collateral estoppel, because the fairness of the attorney's fee has already been determined by the Surrogate's Court of Orange County when it approved the settlement in the underlying action. (Def.'s Mem. at 17–19).

Second, defendants also assert that the plaintiff cannot establish his claim of legal

malpractice. Insofar as the malpractice claim relates to John Mulvehill's failure to suggest alternatives to the agreed-upon contingency fee, defendants contend that prior to signing the retainer agreement no attorney-client relationship existed, and hence Mulvehill was under no obligation to suggest other fee arrangements. (*Id.* at 21). As for the balance of the malpractice claim, defendants contend that they should prevail because, in light of the favorable settlement obtained in the underlying action, plaintiff cannot establish that defendants breached any duty to him or that any alleged breach proximately caused actual damages, that is, that, but for negligence on the part of the attorneys, plaintiff would have received a more favorable result. (*Id.* 25–29).

Third, defendants contend that because the results obtained in the underlying action were in the client's best interest, plaintiff has failed to establish a breach of fiduciary duty. (*Id.* at 25).

Fourth, defendants contend that insofar as plaintiff's allegations of fraud and breach of contract are indistinguishable from the malpractice claim, they are barred under New York law. (*Id.* at 30–31). Alternatively, they argue that, in any event, the fraud claim cannot be sustained because plaintiff is unable to show injury from any alleged misrepresentations or omissions. (*Id.* at 26–29).

Fifth, defendants contend that plaintiff cannot establish that they violated New York's Judiciary Law (*id.* at 32–33), and that, in any event, this claim is barred by the statute of limitations. (*Id.* at 34–35). Finally, defendants contend that plaintiff's claim for punitive damages should be dismissed.

We conclude that plaintiff has failed to demonstrate a triable issue of material fact with respect to any of his claims, except the claim that Urban Mulvehill breached his fiduciary duty in failing to disclose that he would share in the contingency fee payable to John Mulvehill.

## C. *Facts and Prior Proceedings*

On May 16, 1989, plaintiff's wife, Karen Schweizer, was killed when a tractor-trailer crossed the center line of a two-lane roadway and hit her vehicle head-on. (Compl. at ¶ 11; Decl. of Cheryl Riess Curtis, Esq., dated April 6, 1999 ("Pl. Decl.1"), Ex. 1 (police accident report) at second page). Mrs. Schweizer was 35 at the time and a homemaker, although she had apparently planned to go back to work when her son started school. (*See* Dep. of Richard T. Schweizer at 5–6, 11–12). Plaintiff's son, Scott Schweizer, then five years old, was a passenger in his mother's car when the accident occurred. (*See* Compl. at ¶ 12). He suffered a broken arm and other minor injuries, as well as some degree of psychological trauma. (*See* Pl. Decl. 1, Ex. 4 (hospital report) & Ex. 7 (January 5, 1999 psychiatric evaluation by Dr. Lawrence Scheff); Decl. of Geoffrey W. Heineman, Esq., dated April 27, 1999 ("Def.Decl.2"), Ex. E (October 6, 1990 evaluation by Dr. Scheff)).

The tractor-trailer that was involved in the accident was owned by Skyway Transportation Incorporated ("Skyway"). (*See* Dep. of James J. Lenihan, President of Skyway, Jan. 6, 1998, at 42–43). It was insured for $1 million by American Reliance Insurance Companies ("Reliance"). (*See id.* at 43, 47; *see also* Pl. Decl. 1, Ex. 14 (Oct. 19, 1989 letter to J. Mulvehill from Lesley Klotz, Assistant Casualty Claims Supervisor for Reliance)).

Shortly following the accident, in June 1989, plaintiff contacted Urban Mulvehill in order to have a will drafted. (*See* Compl. at ¶ 16; Dep. of Urban S. Mulvehill, Esq. ("USM Dep."), at 143). During the course of their initial meeting, they discussed the circumstances of Mrs. Schweizer's death, and Mulvehill recommended his cousin John Mulvehill as an attorney with experience in wrongful-death matters. (Schweizer Dep. at 17–20; USM Dep. at 154). On June 13, 1989, plaintiff first met with John Mulvehill, and he ulti-

mately retained him, on September 23, when he signed an agreement entitling John Mulvehill to a one-third contingency fee on any recovery in the underlying action. (*See* Schweizer Dep. at 21–23, 68–71; Compl. at ¶ 39; Def. Decl. 1, Ex. H (Retainer dated Sept. 23, 1989)). The retainer was simply the standard Blumberg form—which gives the attorney "the exclusive right to take all legal steps to enforce the said claim," provided he "agrees not to settle th[e] action ... without [the undersigned's] written consent." (Def.Decl.1, Ex. H). It also explains that the one-third fee is "33–1/3 percent, of the sum recovered, whether recovered by suit, settlement or otherwise" and that the "percentage shall be computed on the net sum recovered after deducting taxable costs and disbursements." (*Id.*).

At the second meeting with John Mulvehill, in September 1989, Schweizer expressed concern about what he correctly believed to be the $1 million limit of Skyway's insurance policy. According to plaintiff, he received some indication from Mulvehill that more than $1 million was potentially recoverable. (*See* Aff. of Richard T. Schweizer, sworn to April 6, 1999, at ¶ 2 (Mulvehill expressly represented that the policy limit was not a limit on recovery); Schweizer Dep. at 81, 165 ("Q: When did John Mulvehill promise you to prosecute the case for more than the $1 million policy? A: When we had our meeting on the 23rd of September 1989, he mentioned it was possible to hold the in-

surance company liable for an amount more that the million dollar policy limit."), 209 ("When I signed the retainer [John Mulvehill] led me to believe that it was possible to achieve a settlement greater than the limit—the assumed limits of the insurance policy, i.e. $1 million."), 211 ("he said to me 'Don't worry' [about the policy limit]"), 340, 516).

During his discussions with Mulvehill, Schweizer expressed his interest in retaining a lawyer on a more favorable basis than a flat one-third contingency fee. (*See, e.g.*, Schweizer Dep. at 263; Dep. of John H. Mulvehill ("JHM Dep."), at 611 (Schweizer asked if John Mulvehill would consider a 30% contingency)). Mulvehill indicated that 33⅓ percent was the standard fee, and that although Schweizer might be able to find a lawyer to take less than one-third, that was unlikely.[1] (Schweizer Dep. at 58; *see also id.* at 30 ("John [Mulvehill] said that *all* other personal injury attorneys have a one-third contingency fee, and he showed me the form") (emphasis added)). Schweizer's pursuit of either another attorney or a more favorable payment term was limited; he interviewed one other attorney, who also proffered a standard one-third-fee form (*see* Schweizer Dep. at 65–66), before indicating that he wished to retain John Mulvehill.[2]

Sometime after the first meeting with John Mulvehill, but before the second meeting in September 1989—and the signing of the retainer—plaintiff received a

---

1. Schweizer indicated that at least two other attorneys had suggested, subsequent to his retention of John Mulvehill, that other payment options were available. (*See* Schweizer Dep. at 59–62, 329–33 (a Mineola, New York attorney, David Woychik, Esq., told Schweizer that he would have accepted one-third of any recovery in excess of the Reliance offer)). One lawyer, Emily Rapp, a family acquaintance, was the person who initially advised Schweizer to write a letter to the Surrogate's Court (discussed *infra* at pp. 386–87), indicating the size of the offer made prior to the retention of counsel. (Schweizer Dep. at 59–62). Plaintiff also recalled hearing an adver-

tisement for a law firm that would accept cases for a fee equal to one-third of the amount over an existing settlement offer. (*Id.* at 345).

2. Urban Mulvehill indicated in his submission to the Surrogate's Court (discussed *infra* at pp. 397–98) that prior to retaining John Mulvehill, plaintiff had had the names of "five or six" attorneys and that he had intended to interview all of them to determine their "qualifications and fee arrangements." (Def. Decl. 1, at Ex. D (Aff. of Urban S. Mulvehill, Esq., sworn to September 16, 1991) at ¶¶ 4–5). Plaintiff contends that this assertion is

settlement offer from American Reliance of at least $600,000.00.[3] (Compl. at ¶ 27; Schweizer Dep. at 71–72, 75, 78, 80; JHM Dep. at 697). Plaintiff understood the offer to be for cash—as opposed to any form of structured settlement—and decided not to accept it, choosing instead to retain John Mulvehill because, he alleges, Mulvehill had told him that he "shouldn't be concerned about the limits of the [insurance] policy in that it's possible to hold an insurance company liable for an amount greater than the limits of that policy." (Schweizer Aff. at ¶¶ 3, 8; Compl. at ¶ 38–39; Schweizer Dep. at 81).

During the time of Schweizer's preliminary negotiations with and subsequent representation by John Mulvehill, Mulvehill was working full-time as an attorney for Liberty Mutual Life Insurance Company, primarily defending its insureds. He had been a salaried employee of Liberty Mutual since 1961, in legal departments that bore the names of the insurance company's most senior in-house counsel. (JHM Dep. at 156–58). From 1974 to 1991 Liberty Mutual's legal department operated under the name Mulvehill & O'Brien. (Id. at 200–01). Mulvehill also maintained a solo private practice, with a letterhead bearing his name and his home address. (See, e.g., Pl. Decl. 1, Ex. 24). In that practice, Mulvehill handled personal-injury cases as well as other legal matters. (See JHM Dep. at 202–07).

In 1991, when it came to the attention of Liberty Mutual that John Mulvehill was taking on cases beyond those he was handling for its insureds, the company asked Mulvehill to resign. (See Pl. Decl. 1, Ex. 26 (May 17, 1991, letter from A. Paul Goldblum to John W. Allen, Esq.) & Ex. 19 (copy of Liberty Mutual's no-outside-practice policy)). Plaintiff did not know of John Mulvehill's relationship with Liberty Mutual (see JHM Dep. at 369)[4], and asserts that had he known that Mulvehill had full-time employment and was primarily involved in defending personal-injury cases for an insurance carrier, he would not have retained him. (Schweizer Aff. at ¶¶ 5, 6).

Sometime after Schweizer retained John Mulvehill, Mulvehill and his cousin Urban Mulvehill agreed to an apportionment of any contingency fee in the underlying action whereby John Mulvehill would receive 80 percent and Urban 20 percent. (See JHM Dep. at 615; Retainer Statement, signed by Urban S. Mulvehill, Esq., dated Jan. 18, 1990)[5]. John Mulvehill informed Schweizer that Urban would perform some legal duties with respect to the wrongful-death case (JHM Dep. at 370 (having told Schweizer "I would have conflicts in at-

untrue. (Schweizer Dep. at 235 ("blatant lies")).

3. The settlement figure, as understood by plaintiff at the time, was $600,000 (See Schweizer Aff. at ¶ 8; Schweizer Dep. at 63); see also Def. Decl. 1, Ex. T (In the Matter of Schweizer, No. 821–89 (Surr. Ct. Orange Co. Nov. 6, 1991) (Owen, J.) at 3). John Mulvehill indicates that Schweizer told him that the offer was for $600,000, but that, after contacting Reliance himself, John Mulvehill conveyed to Schweizer that the offer was, in fact, for $650,000. (JHM Dep. at 1217); see also Def. Decl. 1, Ex. 14 (Oct. 19, 1989 letter from Lesley Klotz, Reliance claims supervisor, to J. Mulvehill, indicating that Ms. Klotz had conveyed an offer to Schweizer of $300,000 payable to him, and $350,000 in a structured annuity for Scott). Plaintiff complains that he did not know that the offer included payment in the form of annuities, which would have amounted to significantly more than the simple cash value. (Schweizer Aff. at ¶ 8; see

Def. Decl. 1, Ex. 14, at first page (letter from Ms. Klotz indicating that she had told Schweizer that payout on the annuity would be between "6 & 7 million dollars")).

4. John Mulvehill indicates that he disclosed to plaintiff the existence of some relationship with Liberty Mutual (JHM Dep. at 369–70), and that on those occasions when Schweizer called him at Mulvehill & O'Brien, the phone would have been answered by a person saying "Liberty Mutual." (Id. at 370). Schweizer asserts to the best of his recollection it was answered "Mulvehill office." (Schweizer Aff. at ¶ 7).

5. Urban Mulvehill's retainer statement was not included in the exhibits submitted to the court, but was provided by plaintiff upon our request. (See Aug. 23, 1999 letter from W. Robert Curtis, Esq., to Gabrielle Kleinman, Law Clerk).

tending conferences or other scheduled meetings ... and that I would be using the services of Urban Mulvehill on those occasions")), but Schweizer was never informed of Urban Mulvehill's financial interest in the contingency fee. (Schweizer Aff. at ¶ 4; Schweizer Dep. at 214).

Schweizer first became aware of this arrangement when he received a closing statement in February of 1992, following the Surrogate Court's approval of the Offer to Compromise, indicating that Urban Mulvehill was receiving approximately $63,000. (*See* Schweizer Dep. at 215, 233, 290). In the period between the retention of John Mulvehill and the settlement of the underlying action, plaintiff had repeated contacts with Urban Mulvehill and his firm, O'Neill, DiManno & Kelly, in connection with the underlying action. Specifically, meetings took place in the conference room at O'Neill, DiManno (*id.* at 309, 320); plaintiff picked up checks and other documents there (*id.* at 284), and was forwarded checks and other documents by the firm (*id.* at 286); plaintiff received correspondence from Urban Mulvehill (*id.* at 292 (Urban Mulvehill advised plaintiff that the Surrogate had not yet acted on the application for approval of the compromise)); and many letters that plaintiff saw indicated that carbon copies were being sent to Urban Mulvehill. (*See, e.g., id.* at 281, 310, 312, 315). Plaintiff contends that he believed that John Mulvehill was merely keeping his cousin apprised of developments in the case (*id.* at 203 (as a "professional courtesy")), and that Urban Mulvehill's office was convenient to his own downtown office (*id.* at 117, 285, 287) and to the Southern District courthouse, where filings were made. (*Id.* at 93).

In November 1989 Richard Schweizer was appointed administrator of his wife's estate by the Surrogate's Court of Orange County. In February 1990, John Mulvehill, on behalf of Schweizer, filed a personal injury and wrongful death action in this Court against Skyway and George Bell,

seeking damages of $23,500,000. (Def. Decl. 1, Ex. J (Compl. in *Schweizer v. Bell,* 90 Civ. 0979 (S.D.N.Y.) (JFK))).

Among the tasks that John Mulvehill performed in connection with the underlying action, he engaged in some investigation of Skyway's assets. (*See* JHM Dep. at 1216; Pl. Decl. 1, Ex. 23 (Aug. 23, 1990 letter from U. Mulvehill to J. Mulvehill conveying information regarding possible coverage by another insurance carrier and forwarding Dunn & Bradstreet report on Skyway)). At the time of the accident, Skyway's assets consisted of five trucks, a house trailer, a pick-up truck, tools and equipment (*see* Jan. 6, 1998 Lenihan Dep. at 51–55), and its debts consisted of taxes owed to the IRS and to the State of New Jersey. (*See id.* at 72, 120). It does not appear that it had liability coverage beyond the Reliance policy (*see, e.g.,* Jan. 26, 1998 Lenihan Dep. at 43), although the records at the Interstate Commerce Commission indicated that Skyway was insured by Aetna for $750,000.00. (*See id.* at 43, 57; Pl. Decl. 1, Ex. 23 (Aug. 23, 1990 letter from U. Mulvehill to J. Mulvehill)).

In 1993, two years after the settlement of the underlying action, Skyway was dissolved, and the company was re-incorporated as Highway Freight Lines Incorporated ("Highway"), apparently in an effort to reduce the amount of its insurance premium. (*See* Dep. of James J. Lenihan, July 30, 1998, at 43–44; Pl. Decl. 1, Ex. 28 (Corporate Resolution of Skyway dated Aug. 6, 1993)). Skyway "sold" its five tractor-trailers to Highway for $50,000 and the proceeds were used to pay off tax liens. (*See* Jan. 6, 1998 Lenihan Dep. at 120, 130). A house trailer and pick-up truck were discarded due to age. (*See id.* at 53, 55).

As a consequence of the accident, the truck driver, George Bell, pled guilty to a violation of the New York Vehicle and Traffic Law and had his license revoked. (*See* Compl. at ¶ 13). He did not return to work and died a short time later. (*See* Jan. 6, 1998 Lenihan Dep. at 63–64).

George Bell had no assets with which to satisfy a judgment. (*See* Schweizer Dep. at 154).[6]

In the course of litigation, John Mulvehill retained the services of Thomas Kershner, an economist, in order to evaluate the economic loss resulting from the death of Karen Schweizer. The economist valued that loss, discounted to present value, at $1,042,462.[7] (Def. decl. 1, Ex. L (Appraisal of Economic Loss) at 23). Defendants in the underlying action also obtained an analysis of the economic loss, and their economist valued the loss, discounted to present value, at $357,975. (*Id.*, Ex. M (Report of Edmund Mantell, PhD.) at 3).

In April 1991, Schweizer and the two Mulvehills met at the offices of O'Neill, DiManno & Kelly and discussed the underlying action. (*See* Schweizer Dep. at 133; USM Dep. at 394–98, 890–91). At the meeting they discussed the risks of going forward with the trial, the plaintiffs' and defendants' respective expert reports analyzing economic loss, the possibility that Skyway would present some evidence of contributory negligence on the part of Mrs. Schweizer, the evidence of her instantaneous death—affecting plaintiff's prospects of recovering for pre-impact terror—and the likelihood of being able to recover on a judgment in excess of the existing insurance coverage. (*See* USM Dep. at 395–96, 891; *see also* Schweizer Dep. at 145–53). At the conclusion of the meeting it was decided that plaintiff, by his attorneys, would send a "bad-faith letter"[8] to Reliance, demanding a settlement equal to Skyway's policy-limit. (*See* Schweizer Dep. 153–55; USM Dep. at 396). In May 1991, Reliance offered to settle the underlying action for $985,000. This sum reflected the $1 million limit of Skyway's policy, less $15,000 already paid to plaintiff for damage to his vehicle pursuant to no-fault insurance coverage. (Schweizer Dep. at 166, 171, 172, 176, 225). Plaintiff agreed to the offer, with an allocation of $50,000 for Scott's personal injury claim and $935,000 for the wrongful-death claim. (*Id.* at 225, 227).

Subsequent to the successful settlement discussions, Schweizer, by his attorneys, petitioned the Surrogate's Court to approve the settlement and to grant both attorney's fees and distributions. (Def.Decl.1, Ex. O).[9] Before the court issued a decision on the petition, Schweizer submitted a letter to Surrogate Joseph G. Owen, challenging the amount of attorneys' fees under the settlement.[10] (*Id.*, Ex. I (Aug. 15, 1991 letter from Schweizer to Judge Joseph G. Owen)). In that letter Schweizer noted that the difference be-

---

6. There is some indication in the record that Schweizer did not intend to pursue Mr. Bell individually if he obtained a judgment against him. (USM Dep. at 1074).

7. Dr. Kershner calculated the undiscounted loss as $3,761,191. (*Id.*).

8. The effect of the bad-faith letter, according to Urban Mulvehill, was "that if the insurance company [did] not offer the full policy limits and then a judgment [was] brought in that exceed[ed] the policy limits, you [would] be able to recover the difference against the insurance company on the grounds that they should have better protected their insured's interest by settling for the full policy limit." (USM Dep. at 889).

9. The Surrogate's Court had concurrent jurisdiction with the District Court to authorize an appropriate distribution of the amount of re-covery to the persons entitled thereto. *See* N.Y. Est. Powers & Trusts L. § 5–4.6 (Application to Compromise Action); N.Y. Surr. Ct. Proc. Act § 2204 (Judicial Settlement Where Recovery Has Been Had in Negligence Action); *Pollicina v. Misericordia Hosp. Medical Ctr.*, 82 N.Y.2d 332, 338, 604 N.Y.S.2d 879, 882, 624 N.E.2d 974 (1993); *Estate of Elder*, 90 Misc.2d 460, 462, 395 N.Y.S.2d 337, 339 (1977).

10. The compromise reached on Scott's personal injury claim—$50,000—was approved separately by the federal court in which the underlying action had been filed, pursuant to its authority under Local Civil Rule 83.2, Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (Settlement of Actions by or on Behalf of infants, etc.). (Def. Decl. 1, Ex. P (Order to Compromise, signed by Judge John F. Keenan, July 1, 1991)).

tween the offer that he had initially received from the insurance company and the amount of his recovery after deducting attorney's fees under the current settlement was only 7.3 percent. (*Id.* at first page). Schweizer further noted the disparity between his son's recovery of $191,-000 [11] for the loss of his mother and the attorney's fee of over $300,000 for the preparation of what he called "an uncomplicated and straight forward lawsuit." (*Id.* at second page). Schweizer also attached a comparison between the original offer and the settlement. (*Id.,* Ex. I at third page). Schweizer further argued that if the two years of delay between the original offer and the present compromise amount were taken into account, the difference between the two figures would be only 4.5 per cent. (*Id.*).

At the next appearance in Surrogate's Court, Judge Owen noted that he had both a petition requesting the Court to approve the offer of compromise and the letter from Mr. Schweizer indicating reservations about the attorney-fee arrangement. (Def. Decl. 1, Ex. O (Sept. 9, 1991 Tr.) at 3). The court asked Schweizer whether he wanted to consult with counsel other than John Mulvehill, but the plaintiff declined. (*Id.*). The Court then adjourned the proceedings to allow Mr. Schweizer to consult with Thomas N. O'Hara, Esq., Scott's guardian *ad litem,* and to allow Mr. O'Hara the opportunity to prepare a report on the adequacy of the settlement and the appropriate attorney's fee for that portion of the settlement allocated to the

child's wrongful-death claim. The Judge also provided John Mulvehill the opportunity to submit a memorandum of law as to the fee issue. *Id.*

Mr. O'Hara submitted a revised report [12] on September 25, 1991 in which he asserted that the settlement was "prudent" in light of the uncertainty of a trial outcome and "the unlikelihood of collecting any award in excess of the policy limits." (*Id.,* Ex. R (September O'Hara Report) at ¶ 16). The guardian *ad litem* noted that the petition for approval of compromise contained language fixing the attorney's fee at $309,-267.86, and that, because the petition was verified by Mr. Schweizer, he was bound by the judicial admission. (*Id.* at ¶¶ 27–28). Noting further that both the admission and the retainer agreement were binding only on Schweizer himself—and not on his son—the guardian *ad litem* recommended that the fee for Scott Schweizer's share of recovery should be fixed at only 25 per cent.[13] (*Id.* at ¶ 34).

In response to the Surrogate's invitation, John Mulvehill submitted an Attorney's Affirmation outlining the work he had performed in connection with the underlying action, including conducting interviews, taking depositions, selecting experts, and investigating defendants's insurance coverage. (Def. Decl. 1, Ex. N at 1–4). Mulvehill also outlined his "professional" opinion regarding the adequacy of the compromise value, the risks inherent in proceeding to trial and the relative prudence of the settlement. (*Id.* at 7–8).

11. The settlement amount representing damages for wrongful death was distributed between Mrs. Schweizer's husband and son pursuant to the so-called *Kaiser* rule, under which each distributee receives a percentage in proportion to the number of years of dependency during which the distributee would have looked to the deceased for support. *See Matter of Kaiser,* 198 Misc. 582, 100 N.Y.S.2d 218 (1950). Under the *Kaiser* rule, Richard Schweizer received 68.70 percent, and Scott the remaining 31.30 percent. (*See* Def. Decl. 1, Ex. O (Decree) at 4).

12. Mr. O'Hara had previously submitted a report, dated August 23, 1991, in which he had raised no objection to the settlement or to attorney's fees equal to one-third of the total settlement figure. (*See* Def. Decl. 1, Ex. R (August O'Hara Report) at ¶¶ 18, 23).

13. New York courts routinely reduce contingency fees in infant settlements to 25 percent. *See Gerow v. United States,* 1997 WL 538910, at *3 (N.D.N.Y. Apr. 26, 1997) (citing, inter alia, *In re Setting Attorney's Fees to Richard J. Cardali, P C.,* 225 A.D.2d 474, 474–75, 639 N.Y.S.2d 379, 380 (1st Dep't 1996)).

Urban Mulvehill also submitted an affidavit, indicating that he had referred Schweizer to John Mulvehill (Def. Decl. 1, Ex. D (Aff. of U. Mulvehill, sworn to Sept. 16, 1991) at ¶ 2), that the plaintiff had showed an interest in interviewing John Mulvehill but that Schweizer also had had the names of "five or six other attorneys" whom he wished to interview as well (*id.* at ¶¶ 4–6), and that plaintiff had in fact interviewed three attorneys (*id.* at ¶ 7) before retaining John Mulvehill. In his affidavit, Urban Mulvehill recounted that his firm had been retained in connection with plaintiff's estate matters (*id.* at ¶ 8), and set forth the nature of the work that he had performed in connection with the wrongful-death action (*id.* at ¶ 9) and his opinion that the settlement was "the best possible result." (*Id.* at ¶ 18). The affidavit contains no mention, however, of the 80–20 fee-splitting arrangement between the two attorneys.

At a subsequent proceeding in Surrogate's Court, when asked if there was anything else he wished to submit, Schweizer responded in the negative. (Def. Decl. 1, Ex. S (Tr. of Sept. 30, 1991) at 2). On November 22, 1991, Surrogate Owen issued a written decision. The Surrogate adopted the guardian *ad litem*'s recommendation regarding the one-fourth fee for the portion of the recovery allocated to Scott and found that Richard Schweizer was bound by the one-third fee retainer agreement entered into with John Mulvehill. (*Id.,* Ex. T at 3–4). The Surrogate subsequently issued a decree restating his ruling and noting that Schweizer had objected to the fee, that the guardian *ad litem* had submitted a report, and that John Mulvehill had filed two affirmations and Urban Mulvehill had filed an affidavit in the matter. (*Id.,* Ex. O at 3).

In December 1995, Richard Schweizer commenced this action, asserting his current claims. On April 30, 1999 defendants filed a motion for summary judgment on all claims, which we here address.

## ANALYSIS

### I. Standard of Review on Summary Judgment

The court may enter summary judgment only if it concludes that there is no genuine dispute as to any material fact and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See, e.g., Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998). It is axiomatic that the role of the court on such a motion " 'is not to resolve disputed issues of fact but to assess whether there are factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party.' " *Miner v. City of Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991).

The movant bears the initial burden of informing the court of the basis for his motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making this judgment, all facts must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-moving party has the burden of proof as to a particular issue, the movant may satisfy his initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See, e.g., Ray Repp & K & R Music, Inc. v. Webber,* 132 F.3d 882, 890 (2d Cir.1997), *cert. denied,* 525 U.S. 815, 119 S.Ct. 52, 142 L.Ed.2d 40 (1998); *Gummo v. Village of Depew,* 75

F.3d 98, 107 (2d Cir.), *cert. denied,* 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996). If the movant fails to meet his initial burden, the motion will fail even if the opponent does not submit any evidentiary matter to establish a genuine factual issue for trial. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *BBS Norwalk One, Inc. v. Raccolta, Inc.,* 117 F.3d 674, 677–78 (2d Cir.1997); *Zanghi v. Incorporated Village of Old Brookville,* 752 F.2d 42, 46 (2d Cir.1985).

If the movant carries his initial burden, the burden shifts to the party opposing the motion to demonstrate a genuine dispute as to one or more of the material facts. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 521 (2d Cir.1996), *cert. denied sub nom. Zollo Drum Co., Inc. v. B.F. Goodrich Co.,* 524 U.S. 926, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998). In doing so, the opposing party cannot rest on "mere allegations or denials" of the facts asserted by the movant, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 526 (2d Cir.1994), nor can he rely on his pleadings or on merely conclusory factual allegations. He must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *B.F. Goodrich,* 99 F.3d at 521. Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. *See, e.g., Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996); *West–Fair Elec. Contractors v. Aetna Cas. & Sur. Co.,* 78 F.3d 61, 63 (2d Cir.1996).

To demonstrate a "genuine dispute," the opposing party must come forward with sufficient evidence to justify a reasonable jury returning a verdict in his favor. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita Elec. Indus.,* 475 U.S. at 586–87, 106 S.Ct. 1348; *Cinema North Corp. v.*

*Plaza at Latham Assocs.,* 867 F.2d 135, 138 (2d Cir.1989). If, however, "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9–10 (2d Cir. 1983) (citing *New York State Energy Research & Dev. Auth. v. Nuclear Fuel Serv. Inc.,* 666 F.2d 787, 790 (2d Cir.1981)); *Stewart v. Florence Nightingale Health Ctr./Carnegie Partners, Inc.,* 1999 WL 179373, at *5 (S.D.N.Y. Mar. 31, 1999).

## II. *Collateral Estoppel*

Defendants assert that plaintiff's claims of malpractice, breach of contract, breach of fiduciary duty and fraud are all barred by the doctrine of collateral estoppel. They contend that plaintiff challenged the propriety of the attorney's fees before the Surrogate's Court and that because of that court's approval of the settlement, including the amount of attorney's fees, plaintiff is now precluded from claiming malpractice, fraud or breach of fiduciary duty based on the settlement or the asserted unreasonableness of the attorney's fees. (Def.'s Mem. at 17–20). Plaintiff contends that he did not litigate these issues before the Surrogate's Court, because he did not then know the facts on which his claims are based and because of that court's limited jurisdiction. (Pl.'s Mem. at 8–11).

The doctrine of collateral estoppel, or issue preclusion, bars subsequent litigation of an issue if the issue in the second action is identical to an issue that was raised, necessarily decided and material in the first action, provided that the party against whom the defense is raised had a full and fair opportunity to litigate the issue in the earlier action. *See, e.g., Leather v. Eyck,* 180 F.3d 420, 425 (2d Cir.1999) (citing *Parker v. Blauvelt Volunteer Fire Co., Inc.,* 93 N.Y.2d 343, 349, 690 N.Y.S.2d 478, 482, 712 N.E.2d 647 (1999)) (quoting *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487 (1984))); *Chisholm–Ryder Co.,*

*Inc. v. Sommer & Sommer,* 78 A.D.2d 143, 144, 434 N.Y.S.2d 70, 71 (4th Dep't 1980).[14] The doctrine applies whether or not the tribunals, the causes of action, or the adversaries are the same. *See Leather,* 180 F.3d at 425; *Chisholm–Ryder,* 78 A.D.2d at 144, 434 N.Y.S.2d at 71. The burden rests on the litigant claiming the benefit of the former judgment "to prove that the issue he now urges was involved in the prior action either by actual implication or necessary implication," *Chisholm–Ryder,* 78 A.D.2d at 144, 434 N.Y.S.2d at 70, and that there was a full and fair opportunity to litigate the decision now said to be controlling. *Bomba v. Silberfein,* 238 A.D.2d 261, 262, 657 N.Y.S.2d 22, 22 (1st Dep't 1997); *D'Arata v. New York Cent. Mut. Fire Ins. Co.,* 76 N.Y.2d 659, 666, 563 N.Y.S.2d 24, 26, 564 N.E.2d 634 (1990). Factors to be considered in determining whether there was such a full and fair opportunity to litigate include, *inter alia,* the nature of the forum; the importance of the issue in the prior proceeding; the incentive and initiative to litigate the issue and the actual extent of such litigation; the competence and expertise of counsel; the availability of new evidence; and the foreseeability of future litigation. *See, e.g., Gilberg v. Barbieri,* 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 51, 423 N.E.2d 807 (1981); *Schwartz v. Public Adm'r of County of Bronx,* 24 N.Y.2d 65, 72, 298 N.Y.S.2d 955, 961, 246 N.E.2d 725 (1969)); *A to Z Assocs. v. Cooper,* 161 Misc.2d 283, 288, 613 N.Y.S.2d 512, 517–518 (1993) (citing *Ryan,* 62 N.Y.2d at 501, 478 N.Y.S.2d at 826, 467 N.E.2d 487).

Here the previous adjudication invoked by defendants is the Surrogate Court's approval of the settlement between plaintiff and Skyway in the underlying action and its approval of the attorney's fees provided for in the retainer agreement. (Def. Decl. 1, Ex. O (Decree of Surrogate's Court of Orange Co., Owen, Surr. J., dated Nov. 11, 1991)). The wrongful-death action was filed in the United States District Court for the Southern District of New York. (*See id.,* Ex. A (Compl. in underlying action)). That court had jurisdiction to approve or disprove the adequacy of any settlement upon application of the plaintiff. (*See* Def. Decl. 1, Ex. P (Order to Compromise and Settlement of Infant's Claim, Keenan, U.S.D.J, dated July 1, 1991)). The Surrogate's Court had concurrent jurisdiction with the District Court to authorize an appropriate distribution of the amount of recovery to the persons entitled thereto.[15] (*See supra* p. 386 n. 9).

■ Plaintiff, through his attorneys, petitioned the Surrogate's Court for its approval of the compromise reached with Skyway, the defendant in the underlying action. Although that Court addressed plaintiff's objection to the contingency fee as presented to it by Mr. Schweizer's letter to the Court (Def.Decl.1, Ex. I), it cannot be said that the Court had presented before it—or reached a determination as to—the issues underlying plaintiff's current claims of malpractice, breach of contract, breach of fiduciary duty and fraud. *See, e.g., Weiss v. Manfredi,* 83 N.Y.2d 974, 976, 616 N.Y.S.2d 325, 326, 639

**14.** In a federal diversity action, "state law is controlling on the question of the applicability of the collateral estoppel doctrine to a given set of circumstances." *Ritchie v. Landau,* 475 F.2d 151, 154 (2d Cir.1973). Both plaintiff and defendants refer to the law of New York (*see, e.g.,* Def.'s Mem. at 17–19; Pl. Mem. at 8–10), which concludes our choice-of-law analysis. *Matter of Tehran–Berkeley Civil and Environmental Engineers and Tippe tts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989); *Matter of Holborn Oil Trading Ltd. and Interpetrol Bermuda Ltd.,* 774 F.Supp. 840, 843 (S.D.N.Y.1991). Similarly,

the claims of malpractice, breach of contract and fiduciary duty, and fraud, discussed below, will be resolved with reference to the law of New York.

**15.** Recovery for wrongful death is for the benefit of the decedent's distributees who have suffered pecuniary injury, and therefore comes within the jurisdiction of the Surrogate's Court. *See* N.Y. Est. Powers & Trusts L. §§ 5–4.1, 5–4.3, 5–4.4, 11–3.3; *Ratka v. St. Francis Hospital,* 44 N.Y.2d 604, 610, 407 N.Y.S.2d 458, 461, 378 N.E.2d 1027 (1978).

N.E.2d 1122 (1994) (plaintiff's failure to vacate the lower court settlement was not determinative, for preclusion purposes, on plaintiff's claim of malpractice based, in part, on the inadequacy of the settlement); *Katash v. Kranis, P.C.*, 229 A.D.2d 305, 306, 644 N.Y.S.2d 276, 278 (1st Dep't 1996) (holding that trial court improperly dismissed plaintiff's malpractice claim as collaterally estopped where plaintiff's motion to vacate stipulation in the underlying action had been denied).[16] Specific allegations on which plaintiff's current claims rest—such as the existence of an express promise by John Mulvehill to prosecute the underlying action for more than $1 million and the failure to disclose the fee-splitting arrangement—were not brought to the Surrogate's attention, and were therefore not fully and fairly litigated.

█ To the extent that defendants argue that the Surrogate's approval of the fee arrangement bars plaintiff from relitigating the reasonableness of the fee as the basis for a claim of malpractice, fraud and breach of fiduciary duty, the application of collateral estoppel to that specific issue is a somewhat closer question. Attorney's fees are subject to judicial scrutiny in a variety of contexts. *See, e.g., Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir.1999); *Krause v. Rhodes*, 640 F.2d 214, 219 (6th Cir.1981) (a contract for contingent fees "should always be subject to the supervision of a court, as to its reasonableness"); *Jacobson v. Sassower*, 66 N.Y.2d 991, 992, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283 (1985); *Bizar & Martin v. U.S. Ice Cream Corp.*, 228 A.D.2d 588, 644 N.Y.S.2d 753, 754 (2d Dep't 1996). The requirements for an application for leave to compromise a claim for wrongful death and personal injuries in Surrogate's Court indicate that the attorney's fee is within that court's jurisdiction and subject to significant scrutiny. *See* Uniform R. for Surr. Ct. § 207.38 (Compromises), 22 N.Y.C.R.R. § 207.38.[17] The

---

**16.** Defendants cite several cases for the proposition that an entitlement to attorney's fees necessarily decides the issue of malpractice and breach of contract, and that therefore any subsequent action for malpractice is barred under the doctrine of collateral estoppel. (*See* Def.'s Mem at 17). However, the cases cited involve earlier adversarial proceedings initiated by counsel seeking payment over the clients' objections to the fee sought, where malpractice was either raised as a defense, or should have been raised. *See Lipton v. Shea & Gould*, 1993 WL 126523, at *1 (S.D.N.Y. Apr.22, 1993) (previous special proceeding brought by counsel in Surrogate's Court to obtain fees in connection with probate proceedings); *John Grace & Co., Inc. v. Tunstead, Schecter & Torre*, 186 A.D.2d 15, 18, 588 N.Y.S.2d 262, 265 (1st Dep't 1992) (previous proceeding in which attorneys made a claim for legal fees and plaintiff argued defense of malpractice); *Chisholm–Ryder*, 78 A.D.2d at 144, 434 N.Y.S.2d at 71 (previous motion for summary judgment granted in favor of attorneys for an account stated); *Nat Kagan Meat & Poultry, Inc. v. Kalter*, 70 A.D.2d 632, 633, 416 N.Y.S.2d 646, 647 (2d Dep't 1979) (previous proceeding in which attorneys sought charging lien against clients). *See also Koppelman v. Liddle, O'Connor, Finkelstein & Robinson*, 246 A.D.2d 365, 366, 668 N.Y.S.2d

29, 30 (1st Dep't 1998) (summary judgment granted for plaintiff-attorney in prior action to recover fee); *Summit Solomon & Feldesman v. Matalon*, 216 A.D.2d 91, 627 N.Y.S.2d 690 (1 Dep't 1995) (prior retaining lien proceeding); *Simao v. Green & Seifter, Attorneys, P.C.*, 213 A.D.2d 1018, 625 N.Y.S.2d 975 (4th Dep't 1995) (prior action by attorneys to recover fees); *Pirog v. Ingber*, 203 A.D.2d 348, 348–49, 609 N.Y.S.2d 675 (2d Dep't 1994) (same); *Altamore v. Friedman*, 193 A.D.2d 240, 245, 602 N.Y.S.2d 894, 897 (2d Dep't 1993) (prior arbitration of legal fee dispute).

**17.** The requirements of the Surrogate's Court Rules include that the petition show the "gross amount of the proceeds of settlement and the amount to be paid as attorneys' fees", 22 N.Y.C.R.R. § 207.38(a)(4), and that the supporting affidavit by the petitioner's attorney show: who will pay the attorney's fee, § 207.38(d)(2) & (3), the services rendered by the attorney in detail, § 207.38(d)(4), and "the amount to be paid as compensation to the attorney, including an itemization of disbursements on the case, and whether the compensation was fixed by prior agreement or based on reasonable value, and if by agreement, the person with whom such agreement was made and the terms thereof." § 207.38(d)(5).

Surrogate determined that a one-third fee on the portion of the recovery not allocated to Scott Schweizer was reasonable, and in doing so it took into consideration the fee itself, the amount of work done by Schweizer's attorneys, and the offer made by Reliance to Schweizer prior to his retention of John Mulvehill.

Although the reasonableness of the fee was thus an issue decided by the Surrogate, we cannot conclude as a matter of law that that determination should be binding on this court. In reaching this conclusion we note that the nature of the party's representation in the prior proceeding is a factor to be considered in analyzing the preclusive effect of a prior determination. *See Ryan*, 62 N.Y.2d at 501, 478 N.Y.S.2d at 827, 467 N.E.2d 487; *Mantin v. Zaslavsky*, 172 Misc.2d 846, 849, 660 N.Y.S.2d 638, 641 (1997). In this case, the decision invoked for purposes of applying collateral estoppel was made while plaintiff was represented by defendants, the very parties he now accuses of a breach of trust, misrepresentation and fraudulent omissions. Moreover, although plaintiff was given an opportunity by the Surrogate to obtain other counsel, which he declined to do, that does not indicate that the representation that plaintiff did receive was sufficient to establish that he had a full and fair opportunity to litigate the present issues before the Surrogate. Apart from the natural disinclination of a represented party to pursue a challenge to his then-current attorneys, we note that plaintiff now contends that he lacked information at the time that, when later acquired, made clearer to him the misconduct of his former attorneys. Specifically, he asserts that he did not see the affidavits that John and Urban Mulvehill submitted to the Surrogate at the time of their sub-

mission. (*See* Schweizer Dep. at 234, 244 (indicating that the copy of Urban Mulvehill's affidavit was sent to him in October 1991); Def. Decl. 1, Ex S. (indicating last conference before Surrogate was Sept. 30, 1991)). Accordingly, plaintiff makes a colorable case for the notion that he did not have the opportunity to bring to the Surrogate's attention the alleged misrepresentations and omissions contained in the attorney affidavits that related to the fairness of the fee.

In sum, although plaintiff's unhappiness with the size of the attorney's fee was brought to Judge Owen's attention, the fact that plaintiff was represented by the parties he is now seeking to hold liable for their conduct, in those proceedings, and in the underlying action as a whole, counsels against the imposition of collateral estoppel.

### III. *The Merits of Plaintiff's Claims*

#### A. *Legal Malpractice*

Defendants contend that they are entitled to summary judgment on plaintiff's claim of legal malpractice.[18] As noted, plaintiff alleges that defendants breached their duty to provide skillful, competent and zealous legal services by (1) failing to properly prepare and pursue the wrongful death and negligence claims for $21,500,-000[19]; (2) failing to inform the plaintiff of alternatives to a one-third contingent retainer; and (3) obtaining a consent to settle from Mr. Schweizer without informing him of the fee-allocation arrangement between them, which constituted a "conflict of interest." (Compl. at ¶¶ 73–78).

We will address in this section plaintiff's claim that the settlement of the underlying

---

18. Plaintiff alleges both "legal malpractice" and "gross legal malpractice." (Compl. at 20 (Heading for the First Cause of Action)). No New York cases define gross malpractice or distinguish it from the ordinary form. *But see Eysaman v. Nelson*, 79 Misc. 304, 140 N.Y.S. 183 (1912) (referring to the gross malpractice of an attorney).

19. The complaint in the underlying action seeks $23,500,000 in damages (*see* Def. Decl. 1, Ex. J at final paragraph). The complaint in the current action alleges defendants' failure to pursue the case for $21,500,000. (*See* Compl. at ¶ 75).

action for the policy limit constituted legal malpractice, and the claim that defendants failed to inform their client of their fee-splitting arrangement. However, the other alleged basis of malpractice—John Mulvehill's failure to offer alternatives to the contingency fee—is more appropriately viewed as an alleged breach of the defendant's fiduciary duty, since the omission complained of falls more naturally within fiduciary law than within malpractice. *See, e.g., Newman v. Silver,* 553 F.Supp. 485, 495 (S.D.N.Y.1982), *aff'd in relevant part,* 713 F.2d 14 (2d Cir.1983) (finding that "staggering fee" constituted breach of fiduciary duty, but not malpractice, because plaintiff's outcome would not have been different in underlying action). (*See also infra* pp. 400–01 n. 29). Accordingly, we will discuss that allegation in connection with plaintiff's fiduciary-breach claim.

■ To prevail on a claim of legal malpractice—a specific form of negligence—a plaintiff must establish the failure of an attorney to exercise the degree of skill commonly exercised by an ordinary member of the legal community, proximately resulting in damages to the client. *See Plentino Realty v. Gitomer,* 216 A.D.2d 87, 88, 628 N.Y.S.2d 75, 75 (1st Dep't), *appeal denied,* 87 N.Y.2d 805, 640 N.Y.S.2d 877, 663 N.E.2d 919 (1995); *Saveca v. Reilly,* 111 A.D.2d 493, 494, 488 N.Y.S.2d 876, 877 (3d Dep't 1985). The four elements of a legal malpractice claim are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual damage resulting from the professional's negligence. *See Leeds v. Sealove,* 1988 WL 83401, at *1 (S.D.N.Y. July 28, 1988); *Freschi v. Grand Coal Venture,* 564 F.Supp. 414, 415 (S.D.N.Y.

1983); *Tinter v. Rapaport,* 253 A.D.2d 588, 590, 677 N.Y.S.2d 325, 326 (1st Dep't 1998); *Mendoza v. Schlossman,* 87 A.D.2d 606, 607, 448 N.Y.S.2d 45, 46 (2d Dep't 1982).

### 1. *Failure to Pursue the Underlying Litigation*

Plaintiff contends that defendants were guilty of professional malpractice by virtue of their adoption of a scheme to settle plaintiff's case on inadequate terms. We conclude that plaintiff's proffered evidence is insufficient to create a triable dispute with respect to whether defendants breached their duty to him and whether he suffered any proximate injury from such a breach.

#### a. *Breach of Duty*

■ Plaintiff contends that John Mulvehill knew from the outset that he would never take the underlying action to trial and that he would instead settle the case for no more that the policy limit. (*See* Compl. at ¶¶ 4, 48–50). Plaintiff also contends that the agreement between the Mulvehills to settle the case for approximately $1 million was a breach of their duty as attorneys for plaintiff.[20] Plaintiff has failed to present sufficient evidence that the failure to seek more than the one-million dollar coverage figure was an unreasonable course of action.

An attorney's decision to pursue one of several reasonable courses of action does not constitute malpractice. *Rosner v. Paley,* 65 N.Y.2d 736, 492 N.Y.S.2d 13, 14, 481 N.E.2d 553 (1985); *see also DuPont v. Brady,* 646 F.Supp. 1067, 1076 (S.D.N.Y. 1986), *rev'd on other grounds,* 828 F.2d 75 (2d Cir.1987); *Hanlin v. Mitchelson,* 623 F.Supp. 452, 456 (S.D.N.Y.1985), *aff'd in relevant part,* 794 F.2d 834 (2d Cir.1986); *Pacesetter Communications Corp. v. Solin & Breindel, P.C.,* 150 A.D.2d 232, 541 N.Y.S.2d 404, 406 (1st Dept.), *appeal dis-*

---

**20.** Plaintiff also makes this argument in support of his claim that John Mulvehill breached the terms of his retainer agreement with the plaintiff. We will discuss this breach-of-contract claim below. (*See infra* pp. 398–99).

*missed,* 74 N.Y.2d 892, 547 N.Y.S.2d 849, 547 N.E.2d 104 (1989). Although settlement of the underlying claim does not preclude a subsequent action for legal malpractice in situations where settlement was effectively compelled by mistakes of counsel, *see, e.g., Broad v. Conway,* 675 F.Supp. 768, (N.D.N.Y.1987); *Rau v. Borenkoff,* 262 A.D.2d 388, 691 N.Y.S.2d 140 (2d Dep't 1999); *Lattimore v. Bergman,* 224 A.D.2d 497, 637 N.Y.S.2d 777 (2d Dep't 1996); *Wolstencroft v. Sassower,* 124 A.D.2d 582, 582, 507 N.Y.S.2d 728, 729 (2d Dep't 1986), plaintiff here has not alleged or attempted to prove that settlement was made necessary by any such attorney error. Plaintiff also does not allege that he was coerced into the settlement by his attorneys. *See, e.g., Broad v. Conway,* 675 F.Supp. 768, 771 (N.D.N.Y.1987) (plaintiff alleging malpractice based on attorney's coercion into accepting settlement). Therefore, in order to prevail, plaintiff would have to establish that settlement of the case was an "[un-]reasonable course of action." *Rosner,* 65 N.Y.2d at 738, 492 N.Y.S.2d at 14, 481 N.E.2d 553; *Williams v. Brentwood Farmers Market, Inc.,* 256 A.D.2d 613, 615, 683 N.Y.S.2d 134, 136 (2d Dep't 1998). Given the risks of success at trial, the range of estimates of economic loss calculated by the experts for both Schweizer and Skyway, and the potential difficulty of recovering monies beyond Skyway's insurance coverage, plaintiff has failed to make a case for the proposition that the decision to adopt the proposed settlement was unreasonable.

There is no question that the significant majority of civil cases, and in particular cases involving personal-injury claims, settle without trial. *See, e.g.,* J.M. Wagner, *Settlement Skills: an Essential Item in a Litigator's Bag of Tricks,* N.Y. Law Journal, July 11, 1991, at S3 (more than 90 percent of cases settle); Francis A. McMorris, *Vast Majority of Year's Personal Injury Claims Result in Settlement,* N.Y. Law Journal, May 31, 1994, at 1 (discussing claims against the City of New York). Thus the fact that defendants here proposed to plaintiff that he agree to settle the underlying lawsuit is not itself evidence of a bad-faith "secret" plan or a sign of lawyer incompetence. Moreover, the undisputed circumstances that faced plaintiff and his attorneys at the time establish only that, as in the vast majority of cases, they were more comfortable with the certitude of settlement than the risk of trial.

Plaintiff sued Skyway in the underlying action, seeking to recover 1) for the conscious pain and suffering of the decedent, Karen Schweizer ($10,000,000); 2) for the conscious pain and suffering of Scott Schweizer ($3,000,000); 3) for the loss of services of Mrs. Schweizer to those persons able to recover in wrongful death, that is, Richard and Scott Schweizer ($10,000,000); and 4) for Richard Schweizer's loss of services and consortium due to Scott's personal injuries ($500,000). (*See* Def. Decl. 1, Ex. J (Compl. in *Schweizer v. Skyway, et al.*), at ¶¶ 1, 16, 17, 22, 24, 30, 31, 33, 34). There was no assurance that a jury would have awarded these amounts, or anything close to them.[21] Quite to the contrary, the expert retained by John Mulvehill to evaluate the economic loss attributable to Mrs. Schweizer's death prepared a report that estimated the loss, discounted to present value, as $1,045,462. (*See* Def. Decl. 1, Ex. L, at 24). Moreover, the same loss, as calculated by Skyway's economist was dramatically lower—approximately one-third of the estimate of plaintiff's expert—because the defendant's economist did not rely on certain favorable inferences drawn by Dr. Kershner. (*Compare id.* at 6, 9 (that decedent would have returned to work shortly); 13 (employment through age 65)); 16 (a real discount rate of 1.2%) *with* Ex. M (Expert Report of Edmund Mantell) at fourth page (employment through 2003.9, i.e., age 50, and calculation and deduction of amount of

---

**21.** We note that the particular facts regarding liability and the extent of the injuries would have made the risk of no or minimal recovery extremely unlikely.

Mrs. Schweizer's self-maintenance); ninth page (discount rate of 7.5%). Dr. Kershner would of course have been subjected to cross-examination on his various assumptions. Moreover, under New York law recovery for wrongful death does not include the sorrow or mental anguish of the survivors, and therefore a jury would have been instructed on the limits of an award in this regard. *See, e.g.*, 1A New York Pattern Jury Instructions: Civil § 2:320 (3d ed.1999).[22]

Similarly, some evidence tended to minimize the extent of Scott Schweizer's psychological injuries. (*See, e.g.*, Def. Decl. 2, Ex. E (Psychiatric Evaluation of Scott Schweizer by Lawrence Sheff, M.D., dated Oct. 6, 1990) at 2–5 (indicating child was doing well in school, test for depression scored within normal range, absence of intrusive thoughts, no recommendation for psychiatric intervention)). Although a jury would likely have been sympathetic to the injuries the child had suffered, a pre-trial evaluation of the case had to take into account the relatively unremarkable report by the psychiatrist. We also note that the decision to settle spared Scott the trauma of testifying about the accident in which his mother had been killed, and thus may well have been a factor in his father's decision to accept the settlement offer.

In addition, photographs of the accident scene show that the wheels of the Schweizer vehicle were not turned, indicating that Mrs. Schweizer had taken no action to avoid the accident. A jury could have inferred from this fact that Mrs. Schweizer was unaware of any danger, thus suggesting that recovery for pre-impact terror was uncertain. (*See* USM Dep. at 921). The same fact could also have been the basis for Skyway's argument to the jury that Mrs. Schweizer had been inattentive and that some diminution of damages,

based on comparative negligence, was warranted. (*See id.* at 1066, 1321, 394–95).

Lastly, the likely difficulty in recovering a judgment much beyond Skyway's insurance coverage is a significant consideration in assessing the reasonableness of the decision to settle the underlying action, and plaintiff has failed to make a case that the weight given to this factor was unreasonable. Schweizer has proffered no evidence that Skyway had any insurance coverage other than the Reliance policy. Moreover, Skyway had limited, illiquid assets, and it was extremely unclear whether, as a practical matter, Schweizer could look to them to satisfy a judgment above the policy limit. (*See infra* at p. 396).

In sum, given the assessment of the economists, the evidence regarding the accident, the cost of going forward with trial, and the potential difficulty of recovery beyond Skyway's coverage, plaintiff cannot show that his lawyers' advice to settle the case constituted a breach of their duties.

b. *Causation & Damages*

██ Plaintiff has also failed to establish causation and damages. These elements of malpractice are closely related to each other because if causation is lacking, it can frequently be said that there are no damages. *See, e.g., Cramer,* 203 A.D.2d at 739, 610 N.Y.S.2d at 662 (no malpractice where plaintiff failed to establish damages resulting from attorney's error). The rule for proof of damages in legal malpractice is stringent. The lawyer's conduct must have caused damages that are actual and ascertainable. "Mere speculation of a loss resulting from an attorney's alleged omissions is insufficient to sustain a prima facie case in malpractice." *Luniewski v. Zeitlin,* 188 A.D.2d 642, 643, 591 N.Y.S.2d 524, 526 (2d Dep't 1992). The loss attributable to malpractice must be real and not hypothetical, and the damages must be readily

---

**22.** Damages for wrongful death, while limited to pecuniary or economic losses, may include "the intellectual, moral, and physical training, guidance and assistance that [the deceased] would have given to [her] child[ ] had [she] lived," *see id,* at § 2:320, a figure that was not explicitly included in Dr. Kershner's analysis of economic loss. (*See* Pl. Mem. at 2).

measurable in economic terms. *See, e.g., Zarin v. Reid & Priest et al.,* 184 A.D.2d 385, 385, 585 N.Y.S.2d 379, 381 (1st Dep't 1992); *Brown v. Samalin & Bock, P.C.,* 168 A.D.2d 531, 532, 563 N.Y.S.2d 426 (2d Dep't 1990). The client-plaintiff will not prevail on a malpractice claim where the damages are "too speculative and incapable of being proven with any reasonable certainty." *Zarin,* 184 A.D.2d at 388, 585 N.Y.S.2d at 382. *See, e.g., Tuckman v. Wachtel,* 200 A.D.2d 507, 508, 606 N.Y.S.2d 679 (1st Dep't 1994); *Gazzola Bldg. Corp. v. Shapiro,* 181 A.D.2d 718, 580 N.Y.S.2d 477, 477–78 (2d Dep't 1992).

Plaintiff's allegation that he would have recovered more if the underlying action had gone to trial or if his lawyers had not confined themselves to settlement within the limits of the relevant insurance coverage does not demonstrate the "actual and ascertainable" damages necessary for a malpractice claim. The speculative nature of what a plaintiff might have recovered at trial is precisely the risk that pre-trial settlement avoids.

Moreover, even if plaintiff were able to prove that there was a breach of duty and that he would have received a judgment in excess of the settlement figure, he could not establish injury because he is limited to what was reasonably collectible from the underlying defendants if the award had exceeded their insurance coverage. *See, e.g., Chiaffi v. Wexler, Bergerman & Crucet,* 116 A.D.2d 614, 614, 497 N.Y.S.2d 703, 703 (2d Dep't 1986). Plaintiff alleges that the insurance coverage was not the outside limit to recovery, that is, that Skyway's successor-in-interest had assets from which a judgment over its policy limit could have been satisfied (*see* Pl. Mem. at 6), but he is reduced to pure speculation on this point. The only proffer in support of plaintiff's contention that a judgment in excess of $1 million could have been enforced is the fact that Skyway's successor-in-interest was still operational as of the time of plaintiff's response to defendants' summary judgment motion in April 1999,.

(*See* Pl.'s Mem. at 14). Highway Freight Lines, Inc., acquired Skyway's equipment, free of any loans, for $50,000. (Jan. 6, 1998 Lenihan Dep. at 73; *but see* Pl. Decl. 1, Ex. 28 (indicating that the transfer of the equipment entailed Highway's assumption of existing loans on the equipment)). Skyway's president testified that the change was motivated by Skyway's increased insurance bill. (Jan. 6, 1998 Lenihan Dep. at 44–45). The inference to be drawn from the testimony of Mr. Lenihan and Frank M. Terranova—possibly an attorney who did work for Skyway—and the corporate documents (Pl. Decl. 1, Exs. 28 & 29) is that the transfer—or more precisely, incorporation under a new name—was motivated by a desire to avoid Skyway's liabilities.

Whether a judgment against Skyway would have been enforceable against Highway's assets, however, is far from certain. In any event, plaintiff has failed to make a case that these assets were recoverable at the time of the underlying settlement. That Skyway continues to exist in some related form is not probative of the fact that its assets would have been subject to the enforcement of a judgment. If malpractice claims could be based on such speculation as to what might have been recovered from an underlying defendant, settlements would frequently subject the participating attorneys to malpractice suits by clients who later become dissatisfied with the risk assessment that they and their counsel engaged in when deciding to settle.

### 2. *Failure to Disclose Fee–Sharing Arrangement*

As a second prong to plaintiff's malpractice claim, he asserts a breach of duty by defendant Urban Mulvehill by virtue of his alleged failure to inform his client of all information material to his decision to either accept or reject the settlement offer. The specific omission is Mulvehill's failure to disclose that he had a pecuniary interest in the outcome of the wrongful-death liti-

gation when he recommended to Schweizer that he accept the proposed settlement.

■ Negligent or willful withholding of information material to the client's decision to pursue a course of action is a breach of the duty of due care. *See, e.g., Ayala v. Fischman,* 1998 WL 726005, *3 (S.D.N.Y. Oct. 15, 1998); *DuPont,* 646 F.Supp. at 1076 (finding attorney, hired to advise client regarding tax shelter, was negligent for failing to advise client of tax risks), *rev'd on other grounds,* 828 F.2d 75 (2d Cir.1987); *see also Hart,* 620 N.Y.S.2d at 849 (attorney's failure to advise his client as to the enforceability of a pledge agreement constituted negligence). If the attorney breaches this duty, then he is liable for any losses suffered by the client as a result of making a decision without the benefit of this information. *DuPont,* 646 F.Supp. at 1076 (citing *Spector v. Mermelstein,* 361 F.Supp. 30, 39–40 (S.D.N.Y.1972)).

■ As noted, to establish a malpractice claim the plaintiff must demonstrate not only the breach of a professional duty, but proximate causation of pecuniary injury as a result. Even if we assume that plaintiff has demonstrated a triable dispute as to the alleged omission by Urban Mulvehill and his reliance on that omission, his allegations fail as a malpractice claim, because, as previously discussed, plaintiff cannot establish injury stemming from the decision to settle the underlying action. Necessarily, then, he has not created a triable dispute as to whether Mulvehill's failure to disclose the fact of the referral-fee proximately caused his injury. Accordingly, this aspect of his malpractice claim must also be rejected as a matter of law.[23]

### B. Breach of Contract

Plaintiff also alleges that the conduct of the attorneys in the underlying action constitutes a breach of contract. He asserts that defendants[24] entered into an agreement with him to provide skillful, competent and zealous legal representation, and that by failing properly to prepare and pursue the wrongful-death and personal-injury claims defendants breached that contract. (Compl.¶ 81). Plaintiff also contends that the failure to identify alternatives to the agreed-upon contingency fee and to disclose conflicts of interest constituted a contract breach. (*Id.* at ¶¶ 82, 83).

Defendants respond that to the extent that plaintiff's claim repeats the factual allegations set forth in the claim of legal malpractice, they should be dismissed as duplicative. (*See* Def.'s Mem. at 33 & n. 22). Defendants further contend that a breach-of-contract action against an attorney cannot be sustained absent an explicit promise by the attorney to obtain a specific result, and that the retainer agreement with Schweizer contained no such explicit promise. (*See id.* at 30).

■ Under New York law "a breach of contract action may be maintained against a professional based on 'an implied promise to exercise due care in performing the services required by the contract.'" *Santulli v. Englert, Reilly & McHugh,* 78 N.Y.2d 700, 705, 579 N.Y.S.2d 324, 326, 586 N.E.2d 1014 (1992) (citing *Video Corp. of America v. Frederick Flatto Assocs.,* 58 N.Y.2d 1026, 462 N.Y.S.2d 439, 448 N.E.2d 1350 (1983); *Bloom v. Kernan,* 146 A.D.2d 916, 917, 536 N.Y.S.2d 897, 898–99 (3d Dep't 1989)).[25] The hold-

---

**23.** We address the same allegation of a material omission in the context of plaintiff's fiduciary-breach claim. For reasons noted there, we conclude that the fiduciary claim should survive summary judgment. (*See infra* pp. 65–68).

**24.** We note that the complaint alleges that "defendants" breached their contract with plaintiff, although plaintiff entered into a con-

tract to prosecute the underlying wrongful-death claim only with John Mulvehill.

**25.** Defendants contend that a claim of breach of contract may be sustained "only where the attorney makes an express promise in the agreement to obtain a specific result and fails to do so." (Def.'s Mot. at 30 n. 22 (citing *Pacesetter Communications Corp. v. Solin & Breindel, P.C.,* 150 A.D.2d 232, 236, 541

ing in *Santulli* allowed a plaintiff to pursue a cause of action based on allegations similar to those underlying a malpractice claim although the three-year limitations period for malpractice had run.[26] However, if the contract claim is nothing but a redundant pleading of a timely malpractice claim, it should be dismissed as duplicative. *See Estate of Re v. Kornstein Veisz & Wexler*, 958 F.Supp. 907, 920–21 (S.D.N.Y.1997); *Sage Realty Corporation v. Rose*, 251 A.D.2d 35, 38, 675 N.Y.S.2d 14, 17 (1st Dep't 1998)(citing *Senise v. Mackasek*, 227 A.D.2d 184, 185, 642 N.Y.S.2d 241 (1st Dep't 1996)).

In addition to pursuing a claim based on an implied promise to use due care, a plaintiff may also pursue a contract claim against an attorney based on a breach of promise to obtain specific results, but only if promise was expressly made. *See, e.g., Sage Realty*, 251 A.D.2d at 38, 675 N.Y.S.2d at 17; *Aglira v. Julien & Schlesinger, P.C.*, 214 A.D.2d 178, 185, 631 N.Y.S.2d 816, 820 (1st Dep't 1995); *Saveca*, 111 A.D.2d at 494, 488 N.Y.S.2d at 877.

Plaintiff alleges an implied promise to use due care. (Compl. at ¶ 81).[27] This aspect of plaintiff's breach-of-contract theory depends upon the same showing as does the malpractice claim. Plaintiff ar-

gues that as a result of defendants' conflict of interest, John Mulvehill's lack of skill as a plaintiff's trial attorney, and time constraints imposed by Mulvehill's full-time employment with Liberty Mutual, defendants were not the zealous advocates to which plaintiff was entitled. Since these allegations require identical proof of a deviation from the professional standard of care in the community, causation and damages, the claim is duplicative of plaintiff's allegations of malpractice, and should be dismissed.

■ To the extent that the complaint alleges a promise to obtain a specific result—that is, an award or settlement in excess of $1 million—plaintiff has not established a triable issue of fact that there was such a promise. The retainer agreement constitutes the only written contract between plaintiff and John Mulvehill, and it does not contain any such language. While the retainer agreement may not be a fully integrated contract within the scope of the parol evidence rule—which would bar the introduction of evidence regarding other terms expressly agreed to by the parties, *see, e.g., Mc Gee & Gelman v. Park View Equities, Inc.*, 187 A.D.2d 1012, 1013, 591 N.Y.S.2d 656, 657 (4th Dep't

---

N.Y.S.2d 404, 406 (1st Dep't)), *appeal dismissed*, 74 N.Y.2d 892, 547 N.Y.S.2d 849, 547 N.E.2d 104 (1989)). However, in *Santulli v. Englert, Reilly & McHugh*, the Court of Appeals explicitly rejected this interpretation of *Pacesetter. See Mediators Inc. v. Manney*, 190 B.R. 515, 531 (S.D.N.Y.1995). The *Santulli* court distinguished *Pacesetter* because the latter case involved a plaintiff's suit on a retainer agreement that contained an express disavowal of any specific promises to the client: "We have made no representations or guarantees to you that any result can or will be obtained, or is likely to be obtained in this matter." 150 A.D.2d at 236, 541 N.Y.S.2d at 404. *See Santulli*, 78 N.Y.2d at 706, 579 N.Y.S.2d at 326, 586 N.E.2d 1014.

26. The holding in *Santulli* was significant because the statute of limitations for contract claims is six years, compared with only three years for malpractice claims. Subsequent to the Court of Appeals ruling in *Santulli*, the legislature amended the relevant statute, mak-

ing the malpractice limitations period three years "regardless of whether the underlying theory is based in contract or tort." N.Y. C.P.L.R. § 214(6), as amended by chapter 623 of the Laws of 1996, effective September 4, 1996; *Russo v. Waller*, 171 Misc.2d 707, 708, 655 N.Y.S.2d 313, 313 (). The new rule does not apply retroactively, that is, to cases such as plaintiff's, which was commenced in 1995. *Mason Tenders District Council Pension Fund v. Messera*, 958 F.Supp. 869, 887 (S.D.N.Y. 1997); *White of Lake George, Inc. v. Bell*, 173 Misc.2d 423, 427, 662 N.Y.S.2d 362, 365 (1997).

27. Plaintiff also alleges breach of contract based on defendants' failure to inform the plaintiff of alternatives to the one-third contingency fee (*id.* at ¶ 82), and the failure to disclose their conflicts of interest. (*Id.* at ¶ 83). These claims are more properly addressed as a breach of fiduciary duty. (*See infra* p. 400 *et seq.*).

1992)—plaintiff has failed to proffer any evidence that such an express promise was made. Indeed, plaintiff's deposition testimony suggests only that Mulvehill held out the possibility of a larger recovery. (*See* Schweizer Dep. at 165 ("he mentioned *it was possible* to hold the insurance company liable for an amount more that the million dollar policy limit")); 209 ("he *led me to believe that it was possible* to achieve a settlement greater than the limit"); 211 ("he said to me *'Don't worry'* [about policy limit]"; 340 ("he said *it was possible* to hold the insurance company liable for an amount greater that the million dollar policy limit."); 516 (statement that recovery in excess of $1 million was "*highly likely* ")(emphasis added throughout)). Plaintiff has, by these admissions, conceded the absence of any promise to obtain specific results.

▮ Finally, although we have found no case law addressing the effect of a client's consent to a settlement on a claim that the attorney breached a promise to obtain specific results that differed from those actually achieved by the settlement, we note that generally the acceptance of work performed—and payment therefor—precludes a later action by a party to the contract for defects in performance. *See Hospital Computer Systems, Inc. v. Staten Island Hosp.*, 788 F.Supp. 1351, 1357 (D.N.J.1992) (citing *Village of Endicott v. Parlor City Contracting Co., Inc.*, 51 A.D.2d 370, 372, 381 N.Y.S.2d 548, 549 (3d Dep't 1976)); *DeFreitas v. Holley*, 93 A.D.2d 852, 853, 461 N.Y.S.2d 351, 352 (2d Dep't 1983) (party for whose benefit a provision is inserted in a contract may waive that provision and accept performance of the contract as is). Therefore, even if plaintiff were able to establish that there was an express promise to obtain more than was actually achieved, plaintiff's consent to the settlement would constitute a waiver of Mulvehill's obligation to perform.

### C. Fraud

▮ The claim of fraud as outlined in the complaint is based on seven separate allegations. Insofar as plaintiff's allegations mirror those underlying the malpractice and contract-breach claims already addressed—that is, that John Mulvehill misled plaintiff into believing that he would prosecute the underlying action for more than $1 million (Compl. at ¶ 86(B))—this claim is duplicative of the allegations of legal malpractice, and should be dismissed. *Mecca*, 258 A.D.2d at 570, 685 N.Y.S.2d at 460; *Sage Realty*, 251 A.D.2d at 38, 675 N.Y.S.2d at 17. Plaintiff also alleges that defendants covered up conflicts of interest. (*Id.* at ¶ 86(C)). Insofar as this allegation mirrors the assertion that defendants failed to disclose Urban Mulvehill's participation in the wrongful-death fee (*id.* at ¶ 86(G)), the claim will be addressed below in the context of a claim for breach of fiduciary duty.

Plaintiff's allegation of an undisclosed conflict of interest can also be construed to include John Mulvehill's failure to disclose his employment with Liberty Mutual. This claim will also be addressed below as a fiduciary-breach claim. The allegation that plaintiff was led to believe that the case was more complex than it really was (*id.* at ¶ 86(D)) is related to allegations regarding the manner in which defendant John Mulvehill negotiated the fee (*id.* at ¶ 86(A)), and is also addressed below in the discussion of defendants' fiduciary duty.

Plaintiff also alleges that defendants misleadingly stated, presumably at the time that the settlement was being considered, that it would be impossible to recover more than $1 million from the defendants in the underlying action (*id.* at ¶ 86(E)), and falsely represented to the Surrogate's Court that plaintiff had interviewed other attorneys and that he was satisfied with the services that had been performed by defendants. (*Id.* at ¶ 86(F)). To the extent that liability for these alleged misstatements is not dealt with else-

where, we address the legal merits of these allegations here.

The law recognizes two types of fraud—actual and constructive. To recover for actual fraud, a plaintiff must prove, by clear and convincing evidence, a misrepresentation of a material fact, falsity, scienter, reliance, and injury. *See New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 288, 662 N.E.2d 763 (1995); *E.I. Du Pont De Nemours & Co. v. Spindle City Distributing Inc.*, 224 A.D.2d 772, 773, 636 N.Y.S.2d 944, 946 (3d Dep't 1996). The elements of constructive fraud are the same except that if the defendant stood in a fiduciary or confidential relationship with the plaintiff, there is no requirement that the plaintiff establish defendant's scienter, that is, his knowledge of the falsity of the representation. *See Zackiva Communications Corp. v. Horowitz*, 826 F.Supp. 86, 89 (S.D.N.Y. 1993); *Del Vecchio by Del Vecchio v. Nassau County*, 118 A.D.2d 615, 618, 499 N.Y.S.2d 765, 768 (2d Dep't 1986); *Brown v. Lockwood*, 76 A.D.2d 721, 730–31, 432 N.Y.S.2d 186, 193–94 (2d Dep't 1980).

As to the alleged statement that plaintiff would not be able to recover more than $1 million from the underlying defendants, plaintiff has failed to establish injury stemming from any such statement. As discussed, plaintiff has failed to establish a triable issue as to the unreasonableness of the settlement, in part because of a failure to show that if the case had gone to trial, the judgment, or the enforceable portion thereof, would have exceeded the settlement figure. Therefore, even if we assume that plaintiff relied on this representation in his decision to accept the settlement, he has failed to establish either that this representation was false—that is, that the case was in fact worth more that the settlement figure—or that his reliance on it caused him damage.[28]

As to the second allegation of fraud—that is, that defendants misrepresented to the Surrogate's Court that plaintiff had had the names of "five or six" other attorneys, that he had interviewed several other lawyers before retaining John Mulvehill, and that plaintiff was satisfied with the performance of his lawyers—there is, again, no triable issue of fact as to whether these statements resulted in damages to the plaintiff. A claim for fraud may be based on misrepresentations to a third party, *see, e.g., Buxton Mfg. Co., Inc. v. Valiant Moving & Storage, Inc.*, 239 A.D.2d 452, 454, 657 N.Y.S.2d 450, 451 (2d Dep't 1997), such as the alleged misrepresentations to the Surrogate's Court. However, plaintiff cannot establish injury stemming from the decision to settle or from the Surrogate's approval of the settlement, even if the Surrogate relied on the defendants' misleading representations. Therefore, even if plaintiff were able to establish at trial that the Surrogate in fact relied upon the misrepresentation regarding the number of lawyers whom plaintiff consulted, he is unable, in light of the settlement entered into, to establish any damages stemming from that reliance.

### D. Breach of Fiduciary Duty

As with the contract and fraud claims, plaintiff's fiduciary-breach claim based on defendants' alleged plan to settle the case should be dismissed, since it duplicates plaintiff's claim of malpractice. *See Mecca*, 258 A.D.2d at 570, 685 N.Y.S.2d at 460; *Sage Realty*, 251 A.D.2d at 38, 675 N.Y.S.2d at 17. The remaining fiduciary-breach allegations include the contentions that the negotiated fee was unfair, that defendants failed to disclose their fee-sharing arrangement, and that John Mulvehill failed to disclose his employment at Liberty Mutual.[29]

---

**28.** As noted, the fact that defendant, as plaintiff's attorney, stood in a fiduciary relationship does not negate the requirement that plaintiff establish that he was injured by any alleged misrepresentations. *See Zackiva Communications*, 826 F.Supp. at 89–90.

**29.** As we note below, a claim of breach of fiduciary duty does not require allegations of

Our analysis of plaintiff's complaint starts with the recognition that an attorney stands in a fiduciary relationship to the client, a relationship that imposes a set of special duties. *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 118, 629 N.Y.S.2d 1009, 1012, 653 N.E.2d 1179 (1995); *In re Cooperman*, 83 N.Y.2d 465, 472, 611 N.Y.S.2d 465, 467, 633 N.E.2d 1069 (1994); *Beltrone v. General Schuyler & Co.*, 252 A.D.2d 640, 640, 675 N.Y.S.2d 198, 199 (3d Dep't 1998); *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976). "The attorney's obligations to the client transcend those prevailing in the commercial marketplace. The duty to deal fairly, honestly, and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interest over the attorney's." *Cooperman*, 83 N.Y.2d at 472, 611 N.Y.S.2d at 467, 633 N.E.2d 1069.

■■■■ Because of this special relationship, a breach of fiduciary duty may give rise to liability in the absence of damages. Therefore, an attorney who makes fraudulent misstatements of fact or law to his client or who fraudulently conceals pertinent information may be required to disgorge any ill-gotten gain even if the plaintiff sustains no direct economic loss. *Excelsior 57th Corp. v. Lerner*, 160 A.D.2d 407, 408–09, 553 N.Y.S.2d 763, 764 (1st Dep't 1990); *Diamond v. Oreamuno*, 24 N.Y.2d 494, 498, 301 N.Y.S.2d 78, 81, 248

N.E.2d 910 (1969) (discussing obligations of corporate officers and directors). *See also ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 996 (2d Cir. 1983) ("but for" and proximate causation not necessary to establish breach of fiduciary duty claim); *Fisher v. Reich*, 1995 WL 23966, at *14 (S.D.N.Y. Jan. 10, 1995); *Northwestern Nat. Ins. Co. v. Alberts*, 769 F.Supp. 498, 506 (S.D.N.Y.1991) ("[A] plaintiff alleging breach of fiduciary duty ... is not required to meet the higher standard of loss or proximate causation."). "This is because the function of such an action, unlike an ordinary tort or contract case, is not merely to compensate the plaintiff for wrongs committed by the defendant but, ... to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates." *Diamond*, 24 N.Y.2d at 498, 301 N.Y.S.2d 78 at 81, 248 N.E.2d 910.

### 1. *The Negotiated Fee*

■■■ Plaintiff contends that John Mulvehill failed to inform him of alternatives to the one-third contingency fee, that is, either an hourly rate for legal services performed or a percentage of the recovery over the amount that had already been offered to plaintiff. (Compl. at ¶ 33, 76). This claim fails as a matter of law.

Under the Code of Professional Responsibility, a lawyer has a duty to deal fairly with his client, including in the negotiation of fees. *See* 22 N.Y.C.R.R. § 1200.11(a)

damages, the absence of which is the basis, at least in part, for granting defendants' motion of summary judgment on plaintiff's claims of malpractice. New York law clearly provides, however, that where breach-of-fiduciary-duty claims mirror allegations of malpractice, they must be dismissed. *See Mecca*, 258 A.D.2d at 570, 685 N.Y.S.2d at 460. If this were not the rule, because an attorney necessarily stands in a fiduciary relationship with his client, the effect would be the elimination of the requirement that a plaintiff prove damages in order to prevail on a claim of malpractice.

The claims we address in terms of breach of fiduciary duty are distinct from the malpractice allegations already addressed. They do not relate to the manner in which the attorney pursued the underlying case, but rather the manner in which the defendants interacted with their client. *See, e.g., Beverly Hills Concepts, Inc. v. Schatz and Schatz, Ribicoff and Kotkin*, 717 A.2d 724, 729, 247 Conn. 48, 55 (1998) (professional negligence by attorney implicates a duty of care, while breach of a fiduciary duty implicates a duty of loyalty and honesty).

(" A lawyer shall not enter into an agreement for, charge or collect an illegal or excessive fee. (b) A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee."). This duty includes an obligation to discuss "the nature (and details) of the contingency fee compensation agreement before any final agreement is reached." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 389 (1994), reprinted in ABA/BNA Lawyer's Manual On Professional Conduct 1001:248 (1995).[30]

In light of the trust and confidence inherent in the attorney-client relationship, *Prial v. Supreme Court Uniformed Officers Ass'n*, 91 Misc.2d 115, 397 N.Y.S.2d 528, 530 (1977), the court may examine a retainer agreement to ensure that "it is not unreasonable or oppressive where it was wrongfully procured." *Newman*, 553 F.Supp. at 495 (citing *In re Schanzer's Estate*, 7 A.D.2d 275, 182 N.Y.S.2d 475, 478–79 (1st Dep't 1959), *aff'd*, 8 N.Y.2d 972, 204 N.Y.S.2d 349, 169 N.E.2d 11 (1960) ("somewhat illiterate" client)). The attorney has the burden of proving that the arrangement was fair and reasonable and fully comprehended by the client. *Petition of Rosenman & Colin*, 668 F.Supp. 788, 797 (S.D.N.Y.1987) (citations omitted), *rev'd on other grounds*, 850 F.2d 57 (2d Cir.1988); *Schanzer*, 182 N.Y.S.2d at 480. As the Second Circuit has stated,

"[A]n attorney who seeks to avail himself of a contract made with his client, is bound to establish affirmatively that it was made by the client with full knowledge of all the material circumstances known to the attorney, and was in every respect free from fraud on his part, or misconception on the part of the client . . . ." [I]t is not necessary for the client to show that the agreement was obtained by fraud or undue influence . . . . Even in the absence of such misconduct the agreement may be invalid if it appears that the attorney "got the better of the bargain", unless he can show that the client was fully aware of the consequences and that there was no exploitation of the client's confidence in the attorney. . . .

*Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 838–39 (2d Cir.1993) (quoting *Greene v. Greene*, 56 N.Y.2d 86, 451 N.Y.S.2d 46, 49, 436 N.E.2d 496 (1982) (internal citations omitted)); *see Shaw v. Manufacturers Hanover Trust Co.*, 68 N.Y.2d 172, 507 N.Y.S.2d 610, 612, 499 N.E.2d 864 (1986); *Paulsen v. Halpin*, 74 A.D.2d 990, 427 N.Y.S.2d 333, 335 (4th Dep't 1980); *In re Peterson's Estate*, 257 A.D. 449, 13 N.Y.S.2d 965, 967 (4th Dep't 1939) (attorney must show that any contract between him and his client is fair and reasonable).

Significantly, a one-third contingency fee is specifically provided for in the rules and regulations of New York, *see* 22 N.Y.C.R.R. § 603.7, Schedule B [31] (rules of

---

**30.** The factors to be discussed with the client are: "a. The likelihood of success; b. The likely amount of recovery or savings, if the case is successful; c. The possibility of an award of exemplary or multiple damages and how that will affect the fee; d. The attitude and prior practices of the other side with respect to settlement; e. The likelihood of, or any anticipated difficulties in, collecting any judgment; f. The availability of alternative dispute resolution as a means of achieving an earlier conclusion to the matter; g. The amount of time that is likely to be invested by the lawyer; h. The likely amount of the fee if the matter is handled on a non-contingent basis; i. The client's ability and willingness to pay a non-contingent fee; j. The percentage of any recovery that the lawyer would receive as a contingent fee and whether that percentage will be fixed or on a sliding scale; k. Whether the lawyer's fees would be recoverable by the client by reason of statute or common law rule; l. Whether the jurisdiction in which the claim will be pursued has any rules or guidelines for contingent fees; and m. How expenses of the litigation are to be handled." *Id.*

**31.** Schedule A provides for a sliding scale. 22 N.Y.C.R.R. § 603.7. Attorneys in personal-injury and wrongful-death cases may chose either the flat ⅓ or sliding scale fee structure. We note that the New York legislature expressly rejected the flat one-third contingency

the New York Appellate Division, First and Second Departments, delineating schedule of reasonable fees in personal injury and wrongful death actions), and represents the standard fee charged by attorneys. *See, e.g., Joint Eastern & Southern District Asbestos Litigation,* 129 B.R. 710, 867 (E.D.N.Y.1991), *judgment vacated on other grounds,* 982 F.2d 721 (2d Cir.1992); Lester Brickman,[32] *Contingency Fee Abuses, Ethical Mandates, and the Disciplinary System: The Cases against Case–by–Case Enforcement,* 53 Wash. & Lee L.Rev. 1339 (1996) (nationally, contingency fees range from 33% to 50%). Under a contingency-fee arrangement, the lawyer's compensation is generally higher than it would be if he or she were retained on an hourly basis, because the lawyer is charging a risk premium, that is, compensation for the risk of nonpayment if the suit does not succeed. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 735–736, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (Blackmun, J., dissenting on other grounds); *520 E. 72nd Commercial Corp. v. 520 E. 72nd Owners Corp.,* 691 F.Supp. 728, 738 (S.D.N.Y. 1988), *aff'd,* 872 F.2d 1021 (2d Cir.1989) (a risk premium as reflected in the contingent fee percentage must be proportionate to the risk being borne by the lawyer). We note also, in light of the overall thrust of plaintiff's complaint, that a contingency-fee arrangement acts, to some degree, to align the interests of the lawyer and client, in contrast to an hourly-fee arrangement, under which the lawyer may be motivated to increase the time expended despite no corresponding benefit to the client.

To the extent that plaintiff argues that he was unreasonably charged a risk-premium in the absence of any real risk, plaintiff does not point to any cases that indicate that where an offer of settlement has been made and rejected by a client, a contingency fee that includes the amount of the original offer is unreasonable. Those cases in which contingency fees have been deemed excessive involve significantly different scenarios. *See, e.g., Rohan v. Rosenblatt,* 25 Conn. L. Rptr. 287, 1999 WL 643501, at *3 (1999) (1/3 contingency fee to recover on client's spouse's $100,000 life insurance policy where carrier had not denied payment and attorney engaged in no investigation or litigation); *Attorney Grievance Comm'n v. Kemp,* 303 Md. 664, 677, 496 A.2d 672, 678 (1985) (one-third contingent fee to collect no-fault benefits excessive); *Wade v. Clemmons,* 84 Misc.2d 822, 826, 377 N.Y.S.2d 415, 420 (Kings Co. Sup.Ct.1975) (holding it unfair to have plaintiff recover nothing—because settlement went to lien holder—so that attorney could recover entire contingency fee). In this case, although the underlying action may have been no more complex than the average personal-injury action, the attorneys nonetheless engaged in some investigation, took and defended depositions, retained an expert, evaluated the financial status of the defendants, prepared court documents, and readied the case for trial. (*See* Def. Decl. 1, Ex. D at ¶ 10, Ex. N at 2–5). Given the presumptive validity of the one-third contingency, we cannot say that the fee was excessive in light of the work done and the approximately two years between retention and settlement of the case.

▮ Plaintiff also alleges that John Mulvehill failed to suggest alternatives to a flat one-third fee. Courts will protect counsel's right to an agreed-upon contingent-fee percentage, unless counsel has forfeited his right to compensation by misconduct, or the agreement was induced by fraud, or the attorney has taken some

---

fee in cases of medical, dental or podiatric malpractice, mandating instead a sliding scale. *See* N.Y. Jud. L. § 474–a.

**32.** Prof. Brickman was retained as an expert by the plaintiff in this case. Excerpts of his deposition testimony were included as an ex-

hibit by the defendants. (*See* Declaration in Further Support of Defendants' Motion for Summary Judgment by Geoffrey W. Heineman, Esq., dated April 27, 1999 ("Def.Decl.2"), Ex. C).

unconscionable advantage of his client, or the agreement is illegal. *Prial,* 91 Misc.2d at 117, 397 N.Y.S.2d at 530; *Rodgers v. Sound of Music Co.,* 74 Misc.2d 699, 702, 343 N.Y.S.2d 672, 676 (1972). We note that even plaintiff acknowledges that he was told that other lawyers might accept less, although that was unlikely. (*See* Schweizer Dep. at 58). The scenario presented by plaintiff does not create a triable issue as to coercion. Schweizer interviewed only one other attorney in the intervening months between his initial meeting with John Mulvehill and his retention of him, and that attorney proposed the same terms as did Mulvehill. (*See* Schweizer Dep. at 65–66). Given the long time between the first meeting and the meeting at which the retainer was signed—the latter having been initiated by Schweizer—and the absence of any showing that Schweizer was unable to retain other counsel or to understand the nature of the fee sought, plaintiff has failed to establish a triable issue as to coercion.

Plaintiff also seems to argue that once he decided to retain Mulvehill, the attorney was obliged to provide a fee schedule that was more favorable to plaintiff. Again, plaintiff cites to no cases indicating that failure to suggest alternative payment schedules, except in extreme situations, *e.g., Rohan,* 25 Conn. L. Rptr. 287, 1999 WL 643501, at *3, constitutes a breach of fiduciary duty or an ethical violation, and we do not find, looking at the facts of the retention and the work actually performed by John and Urban Mulvehill, that plaintiff has raised a triable issue as to the unfairness of the retainer negotiation and the unreasonableness of the fee achieved thereby.

2. *Failure to Disclose Employment at Liberty Mutual*

Plaintiff also alleges that John Mulvehill did not tell him that he was employed by Liberty Mutual, and further asserts that he would not have retained Mulvehill had he known that the lawyer "was an insurance company's defense attorney," because he would have been concerned about where "his allegiances would lie in litigating against an insured defendant." (*See* Schweizer Aff. at ¶ 5). Plaintiff also states that he would not have hired Mulvehill had he know that he was employed in a full time capacity and, therefore, unable to "freely ... attend to [plaintiff's] case except during his time off" (*id.* at 3), or had he known that Mulvehill's terms of employment prohibited any outside practice by its attorneys. (*Id.* at 7).

To the extent that plaintiff alleges that Mulvehill had a conflict of interest because of an allegiance to defending insureds, he has failed to make a case that Mulvehill's failure to disclose his work for Liberty Mutual was a breach of fiduciary duty. Under the Code of Professional Responsibility a lawyer has a duty to avoid conflicts between his own interests and those of his clients, as well as to avoid conflicts that may arise between or among the interests of his clients. *See* Code of Professional Responsibility DR 5–101, 22 N.Y.C.R.R. § 1200.20 & DR 5–105, 22 N.Y.C.R.R. § 1200.24. The conflicts addressed by these provisions, however, involve specific transactions or parties. *See In re Gelbwaks,* 260 A.D.2d 47, 696 N.Y.S.2d 45, 47 (1st Dep't 1999); *In re Leff,* 213 A.D.2d 11, 14, 630 N.Y.S.2d 372, 374 (2d Dep't 1995) (two-year suspension from practice of law was appropriate sanction for, *inter alia* attorney's violation in representing clients in real estate transaction in which he had pecuniary interest and in representing both vendors and purchasers in connection with the transaction). Here, plaintiff's complaint about the fact that Mulvehill had an allegiance to defendants—or insured defendants—does not amount to a viable claim of conflict of interest. In this regard we note that attorneys are generally free to represent both plaintiffs and defendants in litigation, including in personal-injury lawsuits, and at least occasionally do.

Mulvehill's failure to tell plaintiff that he worked full-time for Liberty Mutual and

that his employer expressly prohibited its staff attorneys from handling cases outside of those for which they received their salaries,[33] presents a somewhat closer question. We begin by noting that plaintiff has failed to establish a breach of a duty of care, and, therefore, the relevance of Mulvehill's employment by Liberty Mutual is not whether his handling of the underlying action was affected by his employment. Rather, the issue is whether Mulvehill's failure to disclose his employment to plaintiff at the time he was retained was an omission that violated his duty of honesty and loyalty to the client. *See, e.g., Cooperman*, 83 N.Y.2d at 472, 611 N.Y.S.2d at 467, 633 N.E.2d 1069.

Plaintiff has not pointed to any cases that hold that an attorney is obligated to disclose his employment or other clients, absent the existence of a specific conflict of interest. While an attorney's misrepresentation as to his qualifications may be actionable as a breach of fiduciary duty, *see, e.g., Beverly Hills Concepts*, 247 Conn. at 56, 717 A.2d at 730, plaintiff does not allege that Mulvehill misrepresented his experience as a trial attorney, as an attorney who handled personal-injury cases, or as an attorney who had experience working for an insurance company. (*See* JHM Dep. at 723 ("I told him I worked for an insurance company doing defense work"), 725 ("Basically, I told him I was a litigation attorney"), 727 ("I told him that I handled defense cases.")). Even if Mulvehill's deposition overstates the extent to which he emphasized his experience as an insurance company lawyer, plaintiff's own admission about his minimal inquiry into the qualifications of the attorneys he interviewed (*see* Schweizer Dep. at 30 (indicating minimal inquiry into Mulvehill's experience), 66 (interview with a lawyer named Davoli)) provides no basis for determining that Mulvehill made any misrepresentations. Moreover, we note that plaintiff's concern with the time that his lawyer could

devote to his litigation is in no way unique to the facts of this case, and there is no evidence from which a jury could conclude in this case that Mulvehill's performance in representing plaintiff was adversely affected by any constraints on his available time.

We note that Mulvehill's alleged failure to follow Liberty Mutual's employment policies does not in itself translate into a violation of his fiduciary duty to the plaintiff. The issue is not Mulvehill's character or ethics, but whether he owed a duty to disclose his employment to plaintiff. Absent a showing that Mulvehill's obligations to Liberty Mutual would necessarily impact the quality or nature of the representation to be provided to plaintiff, Mulvehill's alleged misconduct towards another client, while potentially actionable by that client, does not constitute a breach of Mulvehill's duty to plaintiff.

In sum, plaintiff's *ex post* determination that he would not have hired Mulvehill does not provide the basis for a fiduciary-breach claim. Mulvehill made no misrepresentation and had no specific duty to disclose the information that he allegedly withheld. Accordingly, plaintiff fails as a matter of law to demonstrate a breach of a fiduciary duty by Mulvehill.

### 3. *Failure to Inform Plaintiff Regarding Fee–Splitting*

Plaintiff alleges that defendants' failure to disclose that Urban Mulvehill was to receive a portion of his cousin's contingency fee constituted a breach of fiduciary duty. (Compl. at ¶ 77). Although we rejected plaintiff's malpractice claim based on similar allegations, the requirements for showing causation and damages are relaxed where a claim arises under fiduciary law. Since the allegations deal with the nature of the relationship between the client and his attorneys, we readdress the claim here.

---

**33.** Liberty Mutual's policy did allow for the handling of certain outside matters, such as

cases for the attorney's family and *pro bono* cases. (*See* Pl. Decl. 1, Ex. 19 at 2).

Although plaintiff cannot deny that he was aware of Urban Mulvehill's involvement in prosecuting the underlying action, he contends that he did not know that there was a fee-splitting agreement between John and Urban Mulvehill. Defendants' failure to disclose the agreement is relevant to plaintiff's allegation that he relied upon Urban Mulvehill's advice in accepting the settlement offer—advice that he arguably would have evaluated differently had he known of the fee-splitting.

■ For joint representation to be ethically valid, a client must know that he will be jointly represented.[34] *See Excelsior 57th Corp.*, 160 A.D.2d at 408, 553 N.Y.S.2d at 764 (citing *Carter v. Katz, Shandell, Katz and Erasmous*, 120 Misc.2d 1009, 1017, 465 N.Y.S.2d 991, 997 (1983)); Code of Professional Responsibility DR 2–107, 22 N.Y.C.R.R. § 1200.12 (prohibiting lawyers who are not a part of the same law firm or office from dividing fees unless 1) the client consents "after a full disclosure that a division of fees will be made," 2) the division of fees is proportional to the work performed by each lawyer or each lawyer assumes joint responsibility for the litigation in a writing given to the client, and 3) the total fee of the lawyers is reasonable for the services rendered)). If an attorney performs work on a matter and the client is aware of the work performed, he is deemed to have consented to the attorney performing that work. *Krug v. Offerman, Fallon, Mahoney & Cassano*, 214 A.D.2d 889, 890, 624 N.Y.S.2d 683, 685 (3d Dep't 1995). Here plaintiff clearly knew that Urban Mulvehill was performing work in connection with the wrongful-death suit: he was expressly informed that Urban Mulvehill would attend hearings, he met with Urban Mulvehill, and he received correspondence transmitted by Urban Mulvehill's firm.

However, plaintiff's claim of breach of fiduciary duty turns, not on his knowledge of shared work, but on his alleged lack of knowledge that Urban Mulvehill had an interest in the settlement of the underlying action. Plaintiff contends that because Urban Mulvehill was representing him in estate matters, he relied on his ostensibly independent, disinterested advice as to whether he should accept Reliance's settlement offer. (*See* Schweizer Aff. at ¶¶ 4, 14).

■ We conclude that, given the special relationship of attorney and client, there is a triable issue of fact as to whether Urban Mulvehill breached his duty to disclose fully all facts relevant to plaintiff's decision to accept a settlement at the policy limit, despite plaintiff's failure to allege damages stemming from such nondisclosure. *See Zackiva Communications*, 826 F.Supp. at 88 (breach-of-fiduciary-duty claim does not require allegation of damages) (citing *ABKCO Music*, 722 F.2d 988 (2d Cir.1983)). Although plaintiff may not have been damaged by the fee arrangement insofar as the fee was capped by the retainer agreement, the claim is based, not on the fee itself, but on the impact of Urban Mulvehill's failure to disclose the underlying arrangement. *See, e.g., Eagan by Keith v. Jackson*, 855 F.Supp. 765 (E.D.Pa.1994).

■ John Mulvehill also had a duty to disclose the referral fee arrangement to plaintiff. Under the New York Code of Professional Responsibility, fee sharing is permissible so long as, *inter alia* the client consents to employment of the other lawyer after a full disclosure that a division of fees will be made. *See* DR 2–

---

34. Fee-splitting also requires proof that an attorney who claims part of a legal fee must have shared, to some significant degree, the legal work entailed. *See A. Stanley Proner P.C. v. Julien & Schlesinger P.C.*, 134 A.D.2d 182, 182–184, 520 N.Y.S.2d 771 (1st Dep't 1981); *Oberman v. Reilly*, 66 A.D.2d 686, 687, 411 N.Y.S.2d 23, 25 (1st Dep't), *lv. to appeal dismissed*, 48 N.Y.2d 602, 421 N.Y.S.2d 1026, 396 N.E.2d 205 (1979). Here, there is no dispute that Urban Mulvehill performed a significant amount of legal work in connection with the underlying litigation.

107, 22 N.Y.C.R.R. § 1200.12. The Code provision has been interpreted to require no more than that a client be made aware that another attorney is jointly or independently representing his or her interests at no additional expense. *See Carter,* 120 Misc.2d at 1018, 465 N.Y.S.2d at 997.[35] Plaintiff knew of significant work done by Urban Mulvehill, and the referral fee had no impact on plaintiff's overall legal expenses. In the absence of any other impact from John Mulvehill's failure to disclose his arrangement with Urban Mulvehill, plaintiff has not established a breach of fiduciary duty by John Mulvehill. *See Itar/Tass Russian News Agency v. Russian Kurier, Inc.,* 1999 WL 58680, *9 (S.D.N.Y. Feb. 4, 1999) (declining to impose sanctions under DR 2–107 because the client was not liable for the fees sought in alleged violation of the Code's disclosure requirement).

As to what the remedy might be for the alleged breach by Urban Mulvehill in this case, we note that in *Eagan,* an attorney who had failed to disclose a referral fee forfeited that fee. In that case, the District Court was asked to approve the settlement of a personal-injury case in which the incompetent plaintiff's brother was an attorney who had been appointed his sister's guardian. 855 F.Supp. at 770. The guardian failed to disclose to the court that he was to receive a referral fee equal to one-third of one-third of the settlement figure from the law firm prosecuting the personal-injury claim. *Id.* The court approved the settlement as fair, but, relying on the guardian's lack of candor to the court, ordered his referral fee forfeited and returned to the estate. *Id.* at 788. In any event, the question of remedy need not be addressed until such time as plaintiff prevails on his claim.

### E. *Violation of New York's Judiciary Law*

Plaintiff alleges that defendants made various false statements and material omissions to both plaintiff and the Surrogate's Court, in violation of New York Judiciary Law § 487. Section 487 provides that an attorney who engages in deceit or collusion upon either the court or a party is guilty of a misdemeanor and is liable to the injured party in treble damages to be recovered in a civil action. Defendants contend that plaintiff's claim under section 487 is barred by the statute of limitations, and in any event that the conduct complained of does not rise to the level necessary to sustain liability under section 487.

#### 1. *Statute–of–Limitations Defense*

Defendants contend that plaintiff's claim under section 487 is governed by a three-year statute of limitations and is therefore time-barred. (*See* Def.'s Mem. at 34–35). Plaintiff contends that the appropriate statute of limitations is six years. (*See* Pl.'s Mem. at 25). Under New York law applicable at the time plaintiff filed his complaint, a legal action sounding in malpractice was governed either by the three-year limitations period normally applicable to malpractice actions, N.Y. C.P.L.R. § 214(6), or by the six-year limitations period applicable to contract actions, N.Y. C.P.L.R. § 213(2), depending on the nature of the substantive relief sought by the plaintiff. *Santulli,* 78 N.Y.2d at 707–09, 579 N.Y.S.2d at 327–28, 586 N.E.2d 1014; *Jorgensen v. Silverman,* 224 A.D.2d 665, 665, 638 N.Y.S.2d 482, 482 (2d Dep't 1996). (*See supra* p. 398 n. 26). If, however, a plaintiff sought to recover damages on legal malpractice more than three years after the accrual of the cause of action, that is, relying on the six-year contract limitations period, the damages recoverable were limited to those damages recoverable for breach of contract. *Santulli,* 78 N.Y.2d at 707–09, 579 N.Y.S.2d at 327–28,

---

**35.** *Carter* involved a suit by a lawyer seeking payment from a law firm for work performed, and the law firm was unsuccessful in assert-

ing as a defense the plaintiff-lawyer's failure to disclose the fee arrangement to the client. *Id.*

586 N.E.2d 1014; *Jorgensen,* 224 A.D.2d at 665, 638 N.Y.S.2d at 482.

The Appellate Division, Second Department, has held that a plaintiff in a malpractice action who is thus limited to contract damages may not recover either punitive damages or treble damages under Judiciary Law § 487 since such "damages are not designed to compensate a plaintiff for injury to property or pecuniary interests, and are not customarily recoverable in a breach of contract action." *Jorgensen,* 224 A.D.2d at 665, 638 N.Y.S.2d at 482 (citing *Santulli,* 78 N.Y.2d at 709, 579 N.Y.S.2d. at 328). The First Department has, however, applied the six-year limitations period for fraud actions, *see* N.Y. C.P.L.R. § 213(8), to section 487 claims. *New York City Transit Authority v. Morris J. Eisen, P.C.,* 203 A.D.2d 146, 146, 610 N.Y.S.2d 236, 237 (1st Dep't 1994); *Guardian Life Ins. Co. v. Handel,* 190 A.D.2d 57, 62, 596 N.Y.S.2d 804, 807 (1st Dep't 1993).

Plaintiff's cause of action accrued at the time of settlement of the underlying action in November 1991[36] and he filed this action in December 1995, beyond the three-year limitations period for malpractice recognized by the Second Department, but within the six-year fraud period recognized by the First Department. Because we find that plaintiff's section 487 claim should be dismissed on the merits, we need not speculate as to how the New York Court of Appeals would resolve the issue. *See, e.g., Joint Eastern and Southern District of New York Asbestos Litigation,* 897 F.2d 626, 635 (2d Cir.1990).

2. *The Merits of Plaintiff's Section 487 Claim*

Section 487 broadly provides for a private civil cause of action for treble damages against lawyers who deceive any party or the court. Relief under this statute, however, "must be carefully reserved for the extreme pattern of legal delinquency," *Wiggin v. Gordon,* 115 Misc.2d 1071, 1072, 455 N.Y.S.2d 205, 207 (1982), or for misconduct that is "chronic" *See, e.g., Cresswell v. Sullivan & Cromwell,* 771 F.Supp. 580, 588, n. 4 (S.D.N.Y.1991), *aff'd,* 962 F.2d 2 (2d Cir.1992), *cert. denied,* 505 U.S. 1222, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992); *Gonzalez v. Gordon,* 233 A.D.2d 191, 649 N.Y.S.2d 701 (1st Dep't 1996); *Bridges v. 725 Riverside Drive, Inc.,* 119 A.D.2d 789, 789, 501 N.Y.S.2d 414, 415 (2d Dep't 1986); *Brignoli v. Balch, Hardy & Scheinman,* 126 F.R.D. 462, 467 (S.D.N.Y. 1989). *See also Liebert v. Gelbwaks,* 234 A.D.2d 164, 651 N.Y.S.2d 307 (1st Dep't 1996)(verdict under § 487 reversed where attorney's willfulness was not shown, even though he breached his fiduciary duty by unauthorized release of client's funds from escrow account).

Furthermore, to recover under section 487, a plaintiff must plead and prove both actual deceit by the attorney, *Bernstein v. Oppenheim,* 160 A.D.2d 428, 432, 554 N.Y.S.2d 487, 491 (1st Dep't 1990), and causation, that is, that the deceit or collusion actually caused plaintiff's damages. *See, e.g., Cresswell,* 771 F.Supp. at 588, n. 4; *Manna v. Ades,* 237 A.D.2d 264, 655 N.Y.S.2d 412 (2d Dep't 1997); *DiPrima v. DiPrima,* 111 A.D.2d 901, 490 N.Y.S.2d 607 (2d Dep't 1985); *Brown v. Samalin & Bock, P.C.,* 155 A.D.2d 407, 547 N.Y.S.2d 80 (2d Dep't 1989). There is no causation if the lawyer's complained-of-actions occurred prior to the commencement of a judicial proceeding, as the statute does not apply in a non-judicial context. *Manna,* 655 N.Y.S.2d at 413; *Beshara v. Little,* 215 A.D.2d 823, 823, 626 N.Y.S.2d 310, 311 (3d Dep't 1995).

Plaintiff's section 487 claim alleges that defendants made false statements and intentionally withheld facts from the plaintiff and from the Surrogate's Court. As to the

---

**36.** Plaintiff does not allege any fraudulent concealment or continuous representation to toll the limitations period.

plaintiff, these statements or omissions include: 1) "covering up alternatives" to the one-third contingency fee; 2) promising to prosecute the underlying action for more than $1 million "where there was no actual intent ... to do so"; 3) "covering up conflicts of interest;" 4) stating that the underlying case "was very complex, when, in fact, it wasn't"; and 5) later stating that it was impossible to obtain more than $1 million from defendants in the underlying action. (Compl. at ¶ 90). As to the Surrogate's Court, plaintiff complains of 1) false statements that communications between defendants and plaintiff had occurred, such as defendant's statements that plaintiff had interviewed other attorneys; and 2) a failure to disclose the existence of the referral fee to Urban Mulvehill. (*Id.*). Plaintiff further contends that both he and the Surrogate's Court relied on these statements or omissions. (*Id.* at ¶ 91).

 Even if we were to assume that the Surrogate's Court's approval of the underlying settlement placed all the complained-of attorney conduct within a judicial proceeding, plaintiff would nonetheless fail as a matter of law to establish defendants' liability under section 487. Defendant Urban Mulvehill may have breached his fiduciary duty to plaintiff by failing to disclose his share of the contingency fee. Since, however, plaintiff was aware of Urban Mulvehill's involvement in the prosecution of the underlying action and since his acceptance of the settlement was reasonable, plaintiff has not established that the alleged failure to disclose falls within the "extreme pattern of legal delinquency" necessary to prevail under section 487. Moreover, since plaintiff was not harmed by his acceptance of the settlement in the underlying action, he cannot prove that the alleged deceit on the part of his attorney caused any injury.

 As to plaintiff's allegations regarding the circumstances of his retention of John Mulvehill—that is, Mulvehill's "covering up" alternatives to the one-third fee, his promise to obtain specific results,

his assertion that the case was complex, and his failure to disclose his employment with Liberty Mutual—we addressed claims based on these allegations above, and found them to be without merit. We therefore do not find these statements or omissions to constitute the type of severe misconduct that section 487 addresses.

Similarly, since plaintiff cannot show the falsity of his attorneys' statement that the underlying lawsuit was worth no more than $1 million, he has failed to demonstrate any basis for liability under section 487. Lastly, although plaintiff may be able to show that Urban Mulvehill's representations to the Surrogate's Court regarding the number of attorneys plaintiff had interviewed prior to retaining John Mulvehill were actually false, given the overall reasonableness of the underlying settlement, plaintiff cannot demonstrate any injury proximately caused by these statements.

In sum, in light of the overall reasonableness of the settlement, plaintiff has failed to show extreme misconduct on the part of his attorneys warranting damages under section 487.

### F. *Punitive Damages*

 Finally, plaintiff seeks punitive damages. Punitive damages are available in cases of breach of fiduciary duty, so long as a very high degree of moral culpability is exhibited. *Giblin v. Murphy*, 73 N.Y.2d 769, 772, 536 N.Y.S.2d 54, 56, 532 N.E.2d 1282 (1988); *Vasilopoulos v. Romano*, 228 A.D.2d 669, 670, 645 N.Y.S.2d 501, 503 (2d Dept.1996); *Gibbs v. Breed, Abbott & Morgan*, 181 Misc.2d 346, 693 N.Y.S.2d 426, 432 (1999). Here, plaintiff has failed to proffer evidence from which a reasonable juror could conclude that any action of the defendants—including Urban Mulvehill's alleged failure to disclose his share of the contingency fee to plaintiff— reaches that threshold of moral culpability. We note that the settlement that plaintiff was induced to accept was not an unrea-

sonable one, and that therefore any alleged material omissions had little meaningful impact on the plaintiff. The underlying facts of this case allege a course of conduct that a reasonable jury could not conclude to be so morally reprehensible as to justify the award of punitive damages.

## IV. *Defendant John Mulvehill's Motion for Preclusion and Sanctions*

Defendant John Mulvehill has moved to preclude the plaintiff's use of certain salary information obtained by a December 1998 subpoena on non-party Liberty Mutual, and for sanctions against the plaintiff under 28 U.S.C. § 1927 and under Rules 11 and 37 of the Federal Rules of Civil Procedure. (*See* Def. Mem. in Support of Motion to Preclude and For Sanctions ("Def.Mem.2")). Specifically, Mulvehill contends that the December 1998 subpoena was defective because plaintiff did not provide him with contemporaneous notice. Mulvehill also seeks preclusion of the information turned over by Liberty Mutual because the subpoena sought salary information covering Mulvehill's entire employment at Liberty Mutual although an earlier court order had required Mulvehill to produce his compensation for only a limited number of years. We recommend that the motion for preclusion and sanctions be denied.

At the deposition of John Mulvehill in June 1998, plaintiff sought to determine defendant's salary at Liberty Mutual for the years 1987 to 1991, years for which Mulvehill had indicated that his tax returns were unavailable. (*See id.* at 832–41). To deposition questions about his sal-

ary for these years, Mulvehill initially responded that he did not recall his annual compensation (*id.* at 839–40), and after several more questions, he responded that "he respectfully decline[d] to discuss [his] income at Liberty Mutual." (*See* JHM Dep. 840). On the following day,[37] at another session of Mulvehill's deposition, plaintiff sought an order directing John Mulvehill to provide plaintiff with salary information for 1987 through 1991 (*see* JHM Dep. at 1065–71 (conference with J. Bernikow)), and in response Magistrate Judge Bernikow, to whom this case was originally referred, ruled that plaintiff should provide the requested data. (JHM Dep. at 1067–68). Apparently Mulvehill did not produce the requested data, and Judge Bernikow later issued an order directing defendant to provide the salary information, but only for the years 1989, 1990 and 1991. (*See* Order dated September 8, 1998).[38] There is no indication that Mulvehill ever complied with this order. (*See* Feb. 10, 1998 letter from W. Robert Curtis, Esq., to the Court, at 2).

Prior to the June 1998 sessions of Mulvehill's deposition, plaintiff had sought information regarding Mulvehill's employment at Liberty Mutual by serving a subpoena on non-party Gregory Allard, senior attorney for Liberty Mutual.[39] (Decl. in Opposition of W. Robert Curtis, Esq., and Cheryl Riess–Curtis, Esq., signed March 11, 1999 ("Pl.Decl.2"), Ex. 1 (May 29, 1998 Subpoena of Gregory Allard, Esq.) at 5). There is no indication that Mulvehill objected to the subpoena, even though it called for the production of information—including presumably sal-

---

37. The cover pages to the Mulvehill deposition transcripts beginning at page 799 and at page 1053 both indicate that they took place on June 25, 1998. It appears, however, that the latter took place on the day following the former. (*See* JHM Dep. at 1054 (reference to "yesterday['s]" deposition)).

38. Mulvehill objected to Judge Bernikow's order, but it was affirmed. (*See* Order dated July 20, 1998, Cederbaum, J., at 4–5).

39. The subpoena sought Mulvehill's personnel file; his human resources department file; all documents related to complaints or investigations, including documents related to his violation of the no-outside-practice rule; documents related to his "termination/retirement", Liberty Mutuals personnel guidelines regarding sick days, vacation, etc.; and any copies of the company's newspaper with references to John Mulvehill. (Pl. Decl. 2, Ex. 1, Schedule annexed to the Allard subpoena, at 5–6).

ary data—for the entirety of Mulvehill's employment with Liberty Mutual.

Plaintiff's counsel wrote a letter to defendant's attorney prior to Mulvehill's June deposition sessions, indicating that documents responsive to the Allard subpoena had been received and were available for defendants' inspection. (Def. Decl. 2, Ex. 2 (June 15, 1998 W. Robert Curtis, Esq., letter to Geoffrey W. Heineman, Esq.) at third page; Feb. 10, 1999 Curtis letter, at 2). A second set of documents responsive to the Allard subpoena—those containing Mulvehill's salary information for 1977 through 1991—was sent to plaintiff on December 21, 1998. (Def. Decl. 2, Ex. 4 (Nov. 20, 1998 letter from Ann Walsh, a Liberty Mutual corporate paralegal to Allard, forwarding salary documents) & Ex. 5 (Dec. 21, 1998 letter from John. P. Bracken, Esq., to W. Robert Curtis, Esq., forwarding documents "and the correspondence from Ann Walsh")).

Prior to receipt of the documents containing Mulvehill's salary information, on or about December 17, 1998, plaintiff's attorney served a subpoena directly on John Mulvehill's former employer Liberty Mutual, calling for the production of "all documents in your possession . . . evidencing salar[ ]y and benefit information for employee J.H. Mulvehill, Esq. for the years 1962 to date." (Decl. of Jennifer A. Lowitt, Esq., dated February 18, 1999 ("Def.Decl.3"), Ex. A). It was not until December 24, 1998, that plaintiff first advised defense counsel—apparently by telephone—that this subpoena had been served. (*See id.*, Ex. C at first page). Thereafter, plaintiff's counsel faxed a copy of the subpoena to Mulvehill's counsel late in the day on December 27, 1998. (*See id.*, Ex. B (fax transmittal time stamped "12/27/98 SUN 16:48")). The cover letter accompanying the December 27 fax indicated that Liberty Mutual had already

provided the requested salary information sought by the subpoena (*see id.* at second page ("Liberty Mutual has provided the salary information sought")), although the letter did not specifically indicate that the information had come in response to the recent subpoena.[40] (*See* Pl. Decl. 2, at ¶ 7).

Plaintiff contends that the Liberty Mutual subpoena has been withdrawn. (Feb. 10, 1999 Curtis letter, at 1 n. 1, 3). There is no real dispute about this representation from defendants, although Mulvehill contends that the fact of the subpoena's withdrawal was not communicated to him. (*See* Def.'s Mem. at 13)

### 1. *Preclusion*

A party issuing a subpoena to a non-party for the production of documents during discovery must provide prior notice to all parties to the litigation. Fed. R. Civ. Proc. 45(b)(1). *See, e.g., Spencer v. Steinman*, 179 F.R.D. 484, 487–88 (E.D.Penn. 1998). The purpose of the requirement of prior notice is to afford the other parties an opportunity to object to the production or inspection, or to serve a demand for additional documents or things. Fed. R.Civ.P. 45 committee note, 1991 amendments. *See Seewald v. IIS Intelligent Information Sys., Ltd.*, 1996 WL 612497, at *4 (E.D.N.Y. Oct.16, 1996) (citing *United States v. Santiago–Lugo*, 904 F.Supp. 43, 47 (D.P.R.1995)); *Callanan v. Riggers & Erectors, Inc.*, 149 F.R.D. 519, 520 (D.Vi. 1992). The requirement of prior notice has been interpreted to require that notice be given prior to the issuance of the subpoena, not prior to its return date. *See Biocore Med. Technologies, Inc. v. Khosrowshahi*, 181 F.R.D. 660, 667 (D.Kan. 1998); 9 *Moore's Federal Practice*, 45.03[4][b] at 45–27 (3d Ed.1999).

---

**40.** The parties disagree about whether plaintiff's counsel misrepresented in its December 27, 1998 cover letter and again at a January 12, 1999 conference with the District Court that the salary information had been produced in response to the December 17 subpoena, rather than in response to the earlier subpoena of Mr. Allard. *See* Pl. Decl. 2, at ¶¶ 8–10; (Def.'s Mem. at 12–13).

Here, plaintiff failed to provide notice to the defendants of the December 1998 Liberty Mutual subpoena prior to, or contemporaneously with, its issuance. Therefore, pursuant to Rule 45(b)(1), the subpoena, had it not been withdrawn, would properly be quashed.[41] Since, however, it has been withdrawn, this aspect of defendant's motion is moot.

■■■ Because the information regarding Mulvehill's salary was obtained in response to plaintiff's earlier subpoena on Mr. Allard, the real issue is not the validity of the December 1998 subpoena to Liberty Mutual, but whether Judge Bernikow's order that Mulvehill provide his salary information for 1989 to 1991 limited plaintiff to seeking information for only those years, even if the information was sought from sources other than Mulvehill. We find that Judge Bernikow's ruling did not limit what salary information could be discovered, nor what information is admissible.

Objections to a non-party subpoena are waived if not made within the time specified by Rule 45(c)(2)(B), that is, generally fourteen days. *See Concord Boat Corp. v. Brunwick Corp.*, 169 F.R.D. 44, 48 (S.D.N.Y.1996) (applying time limit to both the defendant and the non-party subject of the subpoena); *United States v. IBM Corp.*, 70 F.R.D. 700, 701–02 (S.D.N.Y. 1976). Mulvehill did not seek to quash or modify the Allard subpoena, despite adequate opportunity to do so.[42] Therefore, he waived any objections to it, and any information obtained from that subpoena should not be precluded on the basis of its possible overbreadth.[43]

Mulvehill may also be seeking preclusion on the basis of his assumption that Judge Bernikow's discovery order prohibited plaintiff from seeking salary information for years other 1989 to 1991, and that this had the effect of invalidating the Allard subpoena. This theory is meritless. We note that Judge Bernikow's ruling came in response to a specific request by plaintiff that Mulvehill provide his salary information for "the relevant period of time of Richard Schweizer's [representation]— during the time that his case was being prosecuted." (*See* JHM Dep. at 1064). In objecting to this request, Mulvehill argued, among other points, that the information was not relevant to issues in the case and that the demand was therefore being made for purposes of harassment. (*See* JHM Dep. 1065–67 (conference before J. Bernikow)). Mulvehill also expressed concern that the information would not be kept confidential by plaintiff or by his counsel. (*See id.* at 1068).

Judge Bernikow expressly rejected Mulvehill's objections based on relevance (*id.* at 1065), and directed that Mulvehill provide the requested information. Under the circumstances, thus, it is plain that Judge Bernikow did not purport to limit the years for which Mulvehill's salary could be requested, and his specification of the years 1989 to 1991 was based plaintiff's limited request. He did not uphold objections based on relevancy for years prior to Mulvehill's representation of Schweizer; indeed, that issue was not presented. Therefore, there is no basis for finding that Judge Bernikow's order narrowed the scope of the Allard subpoena or that it justifies precluding salary information for years prior to 1989.

### 2. *Sanctions*

Finally, we recommend denial defendant's request for sanctions under Rule

---

**41.** *See* Def. Mem. 2, at 6 n. 1 (moving, in the alternative, to have December 1998 subpoena quashed).

**42.** In the case of the Allard subpoena there seems to have also been some delay in providing the defendants with notice. (*See* Pl. Decl. 2, at first page (fax to defendant on Monday, June 1, 1998) & at second page (subpoena signed on Friday, May 29, 1998); Def. Mem. 2, at 3).

**43.** The admissibility of any documents obtained by the Allard subpoena is of course an issue to be dealt with at trial, based on considerations of relevance, authenticity and other pertinent criteria.

37(b)(2)(B), (D) and (E), Rule 11 and 28 U.S.C. § 1927.

Pursuant to Rule 37(b)(2), Mulvehill seeks to have plaintiff and his counsel held in contempt of court, and to require them to pay for the expenses, including attorneys' fees, caused by plaintiff's purported failure to comply with Judge Bernikow's discovery order. Mulvehill argues that because Judge Bernikow limited plaintiff to salary information from 1989 through 1991, the broader subpoena on Liberty Mutual was in violation of that order, and that plaintiff's conduct therefore merits sanctions.

 As noted, Judge Bernikow's order was directed at Mulvehill. Plaintiff's subpoena seeking broader salary information than what Judge Bernikow had ordered Mulvehill to produce was not, therefore, a clear violation of a court order, and certainly not a basis for contempt. *See, e.g., EEOC v. Local 638 ... Local 28 of Sheet Metal Workers',* 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) ("a party may be held in [ ] contempt for failure to comply with an order of the court if the order being enforced is clear and unambiguous, the proof of noncompliance is clear and convincing ..." (citations omitted)).

In any event, as noted, the order in question did not purport to limit the scope of the earlier subpoena on Allard, and hence there is no basis for the contention that plaintiff violated the order. Indeed, the only party to violate Judge Bernikow's order was Mulvehill, who apparently never provided the required salary information. Under the circumstances, no Rule 37 sanctions are appropriate against plaintiff or his attorney.

Defendant also seeks sanctions under Rule 11, based on representations by plaintiff's attorney to the Court that the December 1998 subpoena had been withdrawn, and on representations that defendant had been notified that it had been withdrawn. (*See* Def. Mem. at 12–13).

Defendant's motion for sanctions under Rule 11 should be denied.

We begin by noting that defendant did not comply with the procedural requirements for filing a Rule 11 motion. Although the moving papers indicate that defendant sent a letter to plaintiff indicating his intention to seek sanctions (*see* Def.'s Preclusion Mem. at 12 n. 4; Def. Decl. 3, Ex J (Feb. 16, 1999 letter from Geoffrey W. Heineman, Esq, to W. Robert Curtis, Esq.)), Rule 11(c)(1)(A) requires the movant to serve his motion at least twenty-one days prior to filing it with the Court. *See Lancaster v. Zufle,* 170 F.R.D. 7 (S.D.N.Y.1996). Defendant's failure to comply with the proper procedure is fatal to his motion. *See id.* at 7.

Even if we were to ignore this procedural deficiency, we note that Rule 11 sanctions are to be reserved for extreme cases of misconduct. *See, e.g., Krauth v. Executive Telecard, Ltd.,* 870 F.Supp. 543, 548–49 (S.D.N.Y.1994) (1993 amendments designed to " 'discourage imposition of monetary and other sanctions under [Rule 11] where conduct does not "reach the point of clear abuse" ' ") (citation omitted); *see also* Fed.R.Civ.P. 11, 1993 Advisory Committee Note (stating that 1993 amendment is expected to "reduce the number of motions for sanctions presented to the court"). *See generally Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1326–31 (2d Cir.1995). This is not such a case. The version of events presented by defendant—that is, that the representations of plaintiff's attorney to the Court that the December 1998 subpoena had been withdrawn must have been false because plaintiff was in possession of the requested salary information (*see* Def.'s Mem. at 12)—fails to take into account the fact that a valid subpoena had long before been served on Mr. Allard and that the documents responsive to that subpoena had been transmitted from Liberty Mutual to Mr. Allard's attorney before the subpoena on Liberty Mutual was issued. (*See* Pl. Decl. 2, Ex. 3). Defendant has therefore failed to show a misrepresenta-

tion, let alone extreme misconduct meriting sanctions.

■ The underlying conduct—plaintiff's issuance of a subpoena without contemporaneous notice and the alleged issuance of a subpoena to a non-party that sought broader information than the defendant himself had been required to turn over—also does not merit sanctions. As noted, the December 1998 subpoena was withdrawn, and therefore is not properly the subject of Rule 11 sanctions. *See, e.g., Photocircuits Corp. v. Marathon Agents, Inc.* 162 F.R.D. 449, 451 (E.D.N.Y.1995) (sanctions not appropriate where complaint withdrawn); Rule 11(c)(1)(A) (safe harbor provision). Moreover, as noted, plaintiff's efforts to obtain Mulvehill's salary information was not clearly a violation of Judge Bernikow's order, and are therefore not sanctionable.

Lastly, defendant has not come remotely close to satisfying the stringent criteria for relief under 28 U.S.C. § 1927, which requires a showing of bad-faith conduct by opposing counsel. *See, e.g., Keller v. Mobil Corp.,* 55 F.3d 94, 99–100 (2d Cir.1995) (citing cases); *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986) ("[A]n award made under § 1927 must be supported by a finding of bad faith. . . ."), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

## CONCLUSION

For the reasons noted, we recommend that defendants' motion for summary judgment be granted, except with regard to plaintiff's claim of breach of fiduciary duty by Urban Mulvehill insofar as it is claimed that the attorney did not disclose to his client that he was receiving a portion of the fee payable pursuant to the retainer entered into with John Mulvehill. Defendant John Mulvehill's motion for preclusion of information and for sanctions should be denied.

Pursuant to Rule 72 of the Federal Rules of Civil procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Miriam Goldman Cedarbaum, Room 1330 and to the chambers of the undersigned, Room 1670. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72, 6(a), 6(e).

March 8, 2000.